**TRAMMELL CROW CENTRAL TEXAS, LTD., Petitioner,**

v.

**Maria GUTIERREZ, Individually and as Representative of the Estate of Luis Gutierrez; and Karol Ferman as Natural Parent and as Next Friend of Luis Angel Gutierrez, Respondents.**

No. 07–0091.

Supreme Court of Texas.

Aug. 29, 2008.

Rehearing Denied Nov. 14, 2008.

W. Wendell Hall, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., Mark Ralls, Gonzales Hobit Ferguson, L.L.P., San Antonio, TX, for Petitioner.

Kimberly S. Keller, Keller Law Firm, San Antonio, TX, Joe B. Stephens, Stephens Law Firm, Katy, TX, for Respondents.

J. Mitchell Smith, Germer Gertz, L.L.P., Beaumont, TX, Wendy Ruth Wilson, Texas Apartment Association, Inc., Austin, TX, Kathleen Cassidy Goodman, Boerne, TX, for Amici.

Justice WILLETT delivered the opinion of the Court, in which Justice O'NEILL, Justice WAINWRIGHT, Justice MEDINA, and Justice GREEN joined.

Ten years ago, we noted that "crime may be visited upon virtually anyone at any time or place," [1] and unfortunately, the same is true today. Given the pervasive and often random nature of crime in our society, we have avoided imposing a universal duty on landowners to protect persons or their property from third-party criminal acts.[2] However, we have also recognized that, in some circumstances, the

---

[1]. *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex.1998) (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 56 (Tex.1997) (Owen, J., concurring)).

[2]. *See Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 658 (Tex.1999); *Timberwalk*, 972 S.W.2d at 756.

risk of a crime may be sufficiently unreasonable and foreseeable to justify imposing a duty on landowners to protect invitees while they are on the landowner's property.[3] The parties dispute whether the facts of this case give rise to the exception to the no-duty rule. We conclude they do not; accordingly, we reverse the court of appeals and render judgment in favor of Trammell Crow Central Texas, Ltd. (Trammell Crow).

## I. Background

Around 11 o'clock on the night of February 17, 2002, Patrick Robertson, an off-duty policeman, began his shift as a security guard at the Quarry Market, a 53-acre mall in San Antonio. Following standard procedure, Robertson patrolled the parking lots in an unmarked car while dressed in his police uniform. Shortly after midnight, while driving slowly past the front of the movie theater, he noticed two people he thought were dressed in black hats and jackets standing by the payphones located just to the side of the theater entrance. He made eye contact with them, and they acknowledged his presence. He continued his patrol, heading away from the theater as patrons began exiting the building.

Among those patrons were Luis Gutierrez and his wife Karol Ferman, who had just finished watching a movie and were heading towards their car. Shortly after exiting the building, Karol heard a gunshot. She turned in the direction of the sound and saw a person dressed in black and wearing a ski mask pointing a gun towards her and Luis. The assailant fired again, hitting Luis in the shoulder and causing him to fall to the ground. Luis got back up, and the couple began running. Karol was only able to run a short distance before she fell face-first to the ground and crawled under a nearby car for protection.

Although Karol did not hear any more shots, Luis suffered four gunshot wounds: one in the shoulder, two in the back, and one in the back of the head.

Robertson, who was only a few hundred feet away from the theater when the shots were fired, drove to where Luis lay wounded, secured the crime scene, and notified the police dispatcher of the incident. Meanwhile, security personnel in a different part of the mall saw someone run through a breezeway and get into a green jeep. The security officers chased the jeep onto a nearby road but discontinued the chase when the jeep's occupants fired shots at their vehicle.

Luis was taken to the hospital, where he died of his wounds. Police classified the crime as a homicide and began an investigation, but criminal charges were never filed. Luis's mother Maria and Karol, acting for themselves and for Luis's children, filed a civil suit against Trammell Crow, the property manager of the Quarry Market. Maria and Karol alleged that Trammell Crow negligently failed to provide adequate security at the mall. During the trial, the parties developed competing theories to give context to the otherwise seemingly random attack.

Maria and Karol portrayed the attack as a botched robbery. Karol testified that she saw Luis grab his wallet before they left home for the theater. Although the police recovered other valuables at the crime scene—a watch, a cell phone, keys, some cash, and a broken bracelet—the wallet was never found. Plaintiffs' expert criminologist testified that the absence of Luis's wallet indicated that a robbery had occurred and that attackers intent on murdering a victim would not likely have taken

3. *Timberwalk,* 972 S.W.2d at 756.

the time to loot the body before fleeing the scene.

Trammell Crow countered that Luis was killed in retaliation for providing the police with information regarding a series of burglaries in which he was involved. A few weeks before Luis's death, police officers arrested Luis after finding a stolen watch in his home. Faced with possible charges of possession of stolen property and burglary, Luis provided information about the burglaries and those who committed them. A few weeks later, Luis asked the police for money to relocate after he received threatening messages from those involved in the burglary ring. The officer told Luis that additional protection might be available, but Luis said that he could get himself out of trouble. So the officer gave Luis $250; Luis was killed one week later.

At the close of trial, the jury returned a verdict in favor of Maria, Karol, and the children, and the trial court signed a judgment conforming to the verdict, awarding the plaintiffs over $5 million in damages. Sitting en banc, the court of appeals affirmed in a sharply divided opinion, holding that Trammell Crow owed a duty to Luis as a matter of law and that the evidence was sufficient to support the jury's finding that Trammell Crow breached its duty in a way that proximately caused Luis's death.[4] Trammell Crow contends that the court of appeals erred on both points, arguing that no duty exists because Luis's death was unforeseeable and that any failure on Trammell Crow's part did not proximately cause Luis's death. We begin with the duty question.

## II. Discussion

The existence of a duty is a question of law determined by the court.[5] Generally, a person does not have a duty to protect others from third-party criminal acts.[6] However, "[o]ne who controls the premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee."[7] Foreseeability is established through evidence of " 'specific previous crimes on or near the premises.' "[8]

The evidence establishes that Trammell Crow exercised control over security at the Quarry Market. Current and former Trammell Crow property managers testified that they controlled key aspects of security, including the number of guards on premises and the equipment available to them. Trammell Crow hired off-duty police officers to provide security for the Quarry Market common areas at all times. It also hired a security agency to provide additional security for specific projects. At peak times, three to four security guards patrolled the mall. While working at the mall, the security guards wore their official police uniforms and carried their standard police equipment. The security guards had the discretion to patrol the mall on foot, on bikes, or in unmarked cars, but generally preferred patrolling on bikes, which allowed them to be highly visible, fully mobile during high-traffic periods, and more aware of their surroundings. However, at night, the guards generally preferred to use unmarked cars so they could cover ground more quickly and

---

4. 220 S.W.3d 33, 40, 42.

5. *Timberwalk*, 972 S.W.2d at 756.

6. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

7. *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex.1997).

8. *Timberwalk*, 972 S.W.2d at 756 (quoting *Walker*, 924 S.W.2d at 377).

avoid attracting the attention of potential criminals, thus making it easier to catch criminals in the act of their crimes. Trammell Crow placed responsibility for scheduling the officers with one of the security guards, but the property managers discussed ongoing security matters with the guards on a daily basis and adjusted the security plans as needed. For example, more guards were utilized during the high-density holiday season. When guards expressed concern over teenage loitering at the movie theater, Trammell Crow discussed the matter with the theater owners, who responded by providing their own guard during the weekends.

Trammell Crow does not dispute the issue of control, nor does it dispute Luis's status as an invitee. Instead, Trammell Crow contends that the evidence of previous criminal activity at the mall does not establish that Luis's death was foreseeable.

## A. Evidence of Prior Crimes

In the two years prior to Luis's death, 227 crimes were reported at the Quarry Market. Of these reported crimes, 203 were property and property-related crimes—mostly thefts, but also a handful of burglaries, auto thefts, and incidents of vandalism. Fourteen "other crimes" occurred—thirteen simple assaults[9] and one incident of weapon possession. The re-

maining ten crimes, all robberies, were classified as violent crimes—a category that also includes murder, manslaughter, rape, and aggravated assault.

Although criminal conduct is difficult to compartmentalize,[10] some lines can be drawn. For instance, we have held that reports of vandalism, theft, and neighborhood disturbances are not enough to make a stabbing death foreseeable.[11] Similarly, although the repeated occurrences of theft, vandalism, and simple assaults at the Quarry Market signal that future property crimes are possible, they do not suggest the likelihood of murder.[12] Accordingly, like the court of appeals, we limit our review to the ten instances of violent crime that took place at the Quarry Market during the two years prior to Luis's death. The police records of these undisputed incidents were accurately summarized by the court of appeals as follows:

1. Wednesday, March 29, 2000 at 6:40 p.m.—As a woman exited a store, a man grabbed her purse. She pulled back; but he pushed her, over-powered her and took her purse, ran off, and got into a waiting vehicle. When a witness tried to block the suspect with her vehicle, he rammed her car and fled. This crime was classified by the [San Antonio Police Department (SAPD)] as "robbery."

2. Monday, April 17, 2000 at 12:30 a.m.—As a man was exiting the movie

---

9. The FBI, which created the uniform crime classification system relied on by these crime reports, defines "simple assaults" as "all assaults which do not involve the use of a firearm, knife, cutting instrument, or other dangerous weapon and in which the victim did not sustain serious or aggravated injuries." Dep't of Justice, Fed. Bureau of Investigation, *Uniform Crime Reporting Handbook* (2004), *available at* http://www.fbi.gov/ucr/handbook/ ucrhandbook04.pdf. By comparison, the Texas Penal Code defines an assault to include "intentionally, knowingly, or recklessly" causing bodily injury; an assault is aggravated

when the victim suffers serious bodily injury or the assailant uses or exhibits a deadly weapon in the course of the assault. *See* Tex. Penal Code §§ 22.01(a), 22.02(a). crimes, all robberies, were classified as violent crimes—a category that also includes murder, manslaughter, rape, and aggravated assault.

10. *Timberwalk*, 972 S.W.2d at 758.

11. *Walker*, 924 S.W.2d at 377–78.

12. *See Timberwalk*, 972 S.W.2d at 758.

theater, two men asked if he was "some big shot" and followed the man back into the theater. The two suspects then began to hit the man, knocking him down, and reached into his pocket and took his money, credit cards, necklace, and military ID. The complainant said someone told the suspects to leave him alone, and they fled in a vehicle with a third suspect. The complainant also said the suspects dropped a cellular phone as they were assaulting him. This crime was classified by the SAPD as a "robbery-bodily injury."

3. Sunday, May 7, 2000 at 1:10 a.m.— As a man was walking from a store to his vehicle, two people in a passing car first asked for directions and then said, that if he did not want to die, he should give them his wallet. When the man said he did not have a wallet, the people in the car asked him for his pager, cellular telephone, and keys. While the man relinquished these items, one of the suspects pointed an unknown object covered by a black trash bag. This crime was classified by the SAPD as "robbery-deadly weapon."

4. Saturday, May 20, 2000 at 6:53 p.m.—A suspect entered a store, told an employee he had a heat-activated hand grenade, and demanded money. The employee complied, turning over approximately $750. The purported hand grenade was found to be simulated. When the suspect fled on foot to his vehicle, two off-duty officers working security attempted, on their bicycles, to pursue the vehicle as it left the parking space but they were unable to get close enough to get the license plate number. This crime was classified by the SAPD as "aggravated robbery."

5. Monday, December 18, 2000 at 7:24 p.m.—While seated inside a restaurant, a woman's purse was stolen. When she pursued the purse snatcher into the parking lot, he pushed her away, jumped into the passenger side of a waiting vehicle, and sped away. This crime was classified by the SAPD as "robbery-bodily injury."

6. Wednesday, December 20, 2000 at 7:35 p.m.—A suspect entered a bank located inside a Quarry Market store and presented the teller a handwritten note. The note stated that it was a robbery and the teller should not move or he would be killed and demanded the money in the top drawer. The suspect then handed the teller a large manilla envelope and told the teller to put the note and the money in the top and bottom drawers in the envelope. As the suspect left, he told the teller there were three others in the store with him. This crime was classified by the SAPD as "robbery."

7. Monday, July 9, 2001 at 9:44 p.m.— As a man was sitting in his car with his girlfriend, a suspect tapped on his window with a gun, told the man he needed his vehicle, gave the man time to remove his belongings from the car, and then took the car. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

8. Monday, October 22, 2001 at 11:45 p.m.—As a woman and her companion were walking in the parking lot, they noticed a man standing in front of a parked car, inside of which another individual sat in the driver's seat. The man approached the couple and asked for the time. The woman gave the man the time; and the two continued walking away. The man then demanded their money. As they continued walking, the driver in the parked car stepped out of the car and pointed a gun at them that looked like an Uzi and told the woman "get on the floor and give me all your money or I'm oging [sic] to kill you!!!"

Fearing for their lives, the couple was going to comply. The first man then grabbed the woman's purse, and told the couple not to turn around and look at him. He got into the car, and fled with the other man. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

9. Sunday, January 13, 2002 at 5:48 p.m.—As a woman started to open her car door, a suspect placed an arm around her, placed a gun to her chest, and told her to give him her purse. The suspect fled in a vehicle. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

10. Thursday, January 24, 2002 at 2:05 p.m.—When a store manager chased a shoplifting suspect out into the parking lot to get the suspect's license plate number, the suspect got into a vehicle and steered his vehicle towards the manager, striking the manager's left elbow with the driver's side mirror and causing the manager to spin and fall. This crime was classified by the SAPD as "robbery-bodily injury." [13]

## B. Foreseeability

 To determine whether the risk of criminal conduct is foreseeable, a court weighs the evidence of prior crimes using five factors: proximity, publicity, recency, frequency, and similarity.[14] The evidence is not considered "in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred." [15] Proximity and publicity are not disputed in this case: the ten violent crimes described above all occurred at the Quarry Market, and Trammell Crow knew about these crimes at the time of Luis's death. Therefore, we focus our analysis on the other factors: recency, frequency, and similarity.

### 1. Recency and Frequency

 Although the five factors present distinct considerations, we have previously examined recency and frequency in tandem.[16] A criminal act is more likely foreseeable if numerous prior crimes are concentrated within a short time span than if few prior crimes are diffused across a long time span.[17] For example, in *Mellon Mortgage Co. v. Holder*, we held that a rape was foreseeable when it took place in an area that had witnessed 190 violent crimes in the space of two years, or one violent crime every four days.[18] In contrast, the Quarry Market was home to ten violent crimes committed over a 23–month period prior to Luis's murder, equating to one violent crime every sixty-nine days. A direct comparison between these cases is not definitive, since *Holder* arose in a different city with a different crime rate. However, statistics from the San Antonio area suggest that the Quarry Market has a relatively low rate of violent criminal activity. In 2001, a resident of San Antonio faced a 44,760–to–1 chance of becoming the victim of a violent crime on any given day. In contrast, according to calculations performed by Trammell Crow's expert, the odds of suffering a violent crime on any given day at the Quarry Market during the two years prior to Luis's death were 1,637,630 to 1.

---

13. 220 S.W.3d at 37–38 (reordered from original).

14. *Timberwalk,* 972 S.W.2d at 759.

15. *Id.* at 757.

16. *See id.* at 757–58.

17. *Id.* at 758.

18. 5 S.W.3d 654, 657 (Tex.1999).

Maria and Karol contend that these calculations compare "apples to oranges" because comparing crime rates between a city and a location within the city will not take into account the mobility of the city's population. They also argue that reliance on the citywide crime rate will lead to an incomplete and misleading analysis that fails to include important geographic and demographic considerations. They are certainly right that numeric comparisons may be imperfect and may omit important, less-easily-quantified considerations. Furthermore, we emphasize that no one ratio or odds calculation conclusively resolves the frequency analysis. Crime counts, crime rates, odds calculations, and other comparisons merely serve as data points a court may rely on in determining the frequency of crime in a certain location; just as the frequency analysis is merely one factor in the total foreseeability analysis. Nevertheless, these calculations, performed by a qualified expert, can be used to help a court resolve the difficult question of whether criminal conduct is reasonably foreseeable.

## 2. Similarity

■ In addition to the recency and frequency of past crimes, a court must consider the similarity of the past crimes to the criminal conduct in question.[19] Foreseeability does not require "the exact sequence of events that produced the harm [to] be foreseeable,"[20]—rather, previous crimes need only be "sufficiently similar to the crime in question as to place the landowner on notice of the specific danger."[21] Furthermore, we have recognized that crimes fitting one category can relate to or result in crimes of another category: a string of violent crimes such as robberies or assaults can make other violent crimes like murder or rape foreseeable; a thief entering a dwelling to steal property may also commit personal crimes.[22]

No one had been murdered at the Quarry Market prior to Luis's shooting, but ten robberies had occurred, many with violent characteristics. One of the incidents is particularly striking—a man exiting the theater at 12:30 a.m. on a Monday morning was approached by a group of strangers, who followed him back into the theater, knocked him down, and stole his valuables before fleeing the scene. However, unlike the attack on Luis, the strangers first accosted the victim; their ultimate aim was to take his property; and they did not use a deadly weapon or seriously injure him.

Of the remaining nine crimes, three involved the use of guns, and another involved an unknown object that could have been a gun. However, none of these weapons were ever fired. Three of the nine incidents involved the use of physical force, and four others involved a threat of serious injury or death. However, unlike the attack on Luis, in all three situations involving physical contact, the suspect used force only after the victim pursued the suspect or otherwise tried to regain possession of the stolen items. Furthermore, no one was seriously injured in any of the nine robberies. Two other differences are noteworthy. First, in six of the nine crimes, the perpetrator made a demand on the victim for property, indicating that the primary purpose of the criminal conduct was to obtain property. There is no evidence that Luis's assailant made any demand, threat, or said anything at all; the assailant simply started shooting.

---

19. *Timberwalk,* 972 S.W.2d at 758.

20. *Id.* at 756 (quoting *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996)).

21. *Id.* at 758.

22. *See id.*

Second, three of the robberies were perpetrated on businesses—two stores and a bank—rather than individuals, like the attack on Luis.

### 3. Application

█ Considering the five factors together, we cannot conclude that Luis's murder was foreseeable. Trammell Crow had knowledge of violent crimes that were committed at the Quarry Market within a reasonable time prior to Luis's death. Nevertheless, these previous crimes were not sufficiently frequent and similar to give rise to a duty in this case. Only four times in two years were robberies committed without a prior demand for property. Only three times in two years was a weapon clearly used to commit a robbery. In those same two years, no weapon had been used to harm someone, no victim had been seriously injured, and in only one case was a victim attacked prior to the accompanying theft. Even viewing the attack on Luis as a robbery, as we presume the jury did,[23] the circumstances of this attack are extraordinary. The assailant opened fire from behind at long range without making any prior demand. After missing with the first shot, the attacker proceeded to shoot Luis four times from behind before taking his wallet. Nothing about the previous robberies committed at the Quarry Market put Trammell Crow on notice that a patron would be murdered as part of a robbery on its premises. Thus, Luis's death was not foreseeable, and Trammell Crow did not have a duty to prevent the attack.

### III. Conclusion

"The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care"; otherwise, a person who controls property would be subject to a universal duty to protect against third-party criminal conduct.[24] As we have stated before, "[t]his is not the law"[25]: a landowner is not the insurer of crime victims.[26] The foreseeability requirement protects the owners and controllers of land from liability for crimes that are so random,[27] extraordinary,[28] or otherwise disconnected from them[29] that they could not reasonably be expected to foresee or prevent the crimes.[30] Because the attack on Luis was so extraordinarily unlike any crime previously committed at the Quarry Market, we conclude that Trammell Crow could not have reasonably foreseen or prevented the crime and thus owed no duty in this case. Therefore, without reaching the issue of causation, we reverse the court of appeals' judgment and render a judgment that Respondents take nothing.

Chief Justice JEFFERSON filed a concurring opinion, in which Justice HECHT, Justice BRISTER, and Justice JOHNSON joined.

Chief Justice JEFFERSON, joined by Justice HECHT, Justice BRISTER, and Justice JOHNSON, concurring.

The narrow question is whether this premises owner had a duty to protect this

23. *See City of Keller v. Wilson,* 168 S.W.3d 802, 821 (Tex.2005).

24. *Timberwalk,* 972 S.W.2d at 756.

25. *Id.*

26. *Mellon Mortgage Co. v. Holder,* 5 S.W.3d 654, 658 (Tex.1999).

27. *See Timberwalk,* 972 S.W.2d at 756.

28. *See Walker v. Harris,* 924 S.W.2d 375, 377–78 (Tex.1996).

29. *See Holder,* 5 S.W.3d at 658.

30. *Walker,* 924 S.W.2d at 378.

plaintiff from a third party's criminal act. The broader dispute concerns the extent to which a decision affirming the judgment below would require "conspicuous security" at every point of potential contact between a patron and a criminal. The Court's approach would impose on the Quarry Market (and others similarly situated) an obligation to adopt extraordinary measures to prevent a similar occurrence in the future. It holds that "[b]ecause the attack on Luis was so extraordinarily unlike any crime previously committed at the Quarry Market," Trammell Crow could not have foreseen it and thus owed no duty to protect Gutierrez from the attack. While I agree that Trammell Crow had no such duty, I would conclude not that the attack was unforeseeable, but that the risk of its occurrence was not unreasonable, and that the consequences of requiring premises owners to prevent this type of crime would require a measure of deterrence that is neither feasible nor desirable. Accordingly, I concur in the Court's judgment.

Because a jury found for Gutierrez[1] on disputed facts, Gutierrez contends we must affirm the courts below. Trammell Crow, however, asserts it has no duty under the circumstances, even when all the facts are viewed in favor of the verdict. But the Court must determine whether giving a jury the option to require premise owners to insure against brazen criminal attacks appropriately shifts law enforcement to the private sector. In *Timberwalk*, we held that "[a] duty exists only when the risk of criminal conduct is so great that it is both *unreasonable* and *foreseeable.*" *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex.1998) (emphasis added). The Court's focus solely on the latter is misplaced. There were ten vio-

lent crimes at the Quarry Market within the two years preceding Gutierrez's death; all were robberies, some involved deadly weapons. Given this evidence, it was foreseeable that a robbery and murder could occur.

Granted, it seems trite to say that crime is foreseeable solely because it has occurred in the past, but part of the difficulty in assessing foreseeability lies in the inability to quantify how many prior crimes make a particular attack predictable. *See, e.g.,* Robert Weisberg, *Preventing Crime: Private Duties, Public Immunity,* 2 J.L. Econ. & Pol'y 365, 374 (2006) (noting that the prior-similar-incidents test "has been criticized as arbitrary, or at least unpredictable, because it sets out no metric for the frequency of crimes and the degree of similarity required"). Moreover, focusing solely on foreseeability overlooks other factors we have held are pertinent to the existence and scope of a duty. *Timberwalk*, 972 S.W.2d at 756 (" 'Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties.' " (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 59 (Tex.1997) (Owen, J., concurring))). We must also balance risk, likelihood of injury, and the consequences of placing the burden on the defendant. *General Elec. Co. v. Moritz*, 257 S.W.3d 211 (Tex.2008) ("[D]uty depends on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.").

While the prior-similar-incidents inquiry includes some consideration of risk and likelihood of injury, it does not consider the attendant burdens of requiring premis-

---

1. For brevity, we use "Gutierrez" to refer to both Luis Gutierrez and the respondents in this case.

es owners to prevent all crimes that are similar to prior attacks, nor does it account for crimes that may have been eminently foreseeable despite their never having occurred at a particular place before. *See, e.g.,* Michael J. Yelnosky, Comment, *Business Inviters' Duty to Protect Invitees from Criminal Acts,* 134 U. Pa. L.Rev. 883, 905 (1986) (observing that the test produces "extraordinarily arbitrary results" and "deni[es] . . . compensation to the first victim"); *see also Ann M. v. Pac. Plaza Shopping Ctr.,* 6 Cal.4th 666, 25 Cal. Rptr.2d 137, 863 P.2d 207, 214–15 (1993); *Posecai v. Wal–Mart Stores, Inc.,* 752 So.2d 762, 767 (La.1999) (adopting balancing test, which "seeks to address the interests of both business proprietors and their customers by balancing the foreseeability of harm against the burden of imposing a duty to protect against the criminal acts of third persons"); *Whittaker v. Saraceno,* 418 Mass. 196, 635 N.E.2d 1185, 1188–89 (1994) (noting that "[t]he possibility of criminal conduct occurring is present in almost every aspect of daily life" and "[i]n that sense the possibility of a violent attack is always able to be foreseen," but holding that "society should not place the burden of all harm caused by random violent criminal conduct on the owner of the property where the harmful act occurred, without proof that the landowner knew or had reason to know of a threat to the safety of persons lawfully on the premises against which the landowner could have taken reasonable preventive steps"); *McClung v. Delta Square Ltd. P'ship,* 937 S.W.2d 891, 899, 902 (Tenn.1996) (adopting a balancing test that considers "both the economic concerns of businesses and the safety concerns of customers who are harmed due to the negligence of one seeking their business," in lieu of the "fatally flawed" prior-similar-incidents test). A duty analysis should include consideration of these factors as well.

Gutierrez argues (and Trammell Crow's expert agreed) that had there been a conspicuous security officer posted at the time and place of this fatal attack, the crime may not have taken place. I would hold that the number of similar crimes here, however, while perhaps sufficient to make the attack foreseeable, would not require, in response, snipers on the roof or uniformed officers on every corner. The question is the extent to which we should require premises owners—even those who have experienced crime in the past—to provide the same level of security that airports enlist to prevent terrorism. Life in a free society carries a degree of risk. That risk can be virtually eliminated by a pervasive military presence, but the burdens—both in terms of the economic cost to premise owners and in the oppressive climate a police state spawns—would be prohibitive.

Because the relatively few incidents of violent crime at the Quarry Market during the two-year period before Gutierrez's death did not pose an unreasonable risk of harm, and in light of the tremendous burden that would be required to prevent such brazen attacks, I would hold that Trammell Crow owed Gutierrez no duty to prevent this crime. *See Timberwalk,* 972 S.W.2d at 756 ("[C]riminal conduct of a specific nature at a particular location is never foreseeable merely because crime is increasingly random and violent and may possibly occur almost anywhere, especially in a large city. If a landowner had a duty to protect people on his property from criminal conduct whenever crime *might* occur, the duty would be universal. This is not the law."). I agree with the dissenting justices below that recognizing such a duty would "replace [*Timberwalk* and *City of Keller*] with a rule of strict liability for premises owners." 220 S.W.3d at 43 (Dun-

can, J., dissenting). I concur in the Court's judgment.