COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH



NO. 2-07-398-CV

TERA D. DURHAM, ANGELA R. GLOVER, CORNELIUS STANLEY AND CRAIG WILSON

APPELLANTS

V.

PETER A. ZARCADES, INDIVIDUALLY, AND AS TRUSTEE OF THE PETER A. ZARCADES SEPARATE PROPERTY TRUST AND AS TRUSTEE OF THE TRUST INDENTURE OF PETER A. ZARCADES AND SANDRA RAE ZARCADES

APPELLEE

------------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

This is a premises liability case. Appellants Tera D. Durham, Angela R. Glover, Cornelius Stanley, and Craig Wilson are attempting to recover damages from prior owners of an apartment complex in which appellants were victims of a third-party crime on the theory that the prior owners' acts and omissions

created conditions favorable to the third-party crime. In six issues, appellants attack the trial court's summary judgment in favor of the prior owners on appellants' claims for negligence, premises liability, negligence per se, and negligent activity, as well as their right to recover exemplary damages. We affirm.

**Background Facts**

On October 22, 2007, appellants sued appellee Peter Zarcades— Individually, as Trustee of the Peter Zarcades Separate Property Trust, and as Trustee of the Trust Indenture of Peter Zarcades and Sandra Rae Zarcades (collectively, the Trusts)—based on an incident in which appellants were held hostage at gunpoint and sexually assaulted in unit 411[1] of the Skyline Place Apartments, a property in which appellee, as Trustee of the Trusts, had formerly owned percentage interests.[2]

---

[1] Glover leased unit 411; the other appellants were visiting her when the crime occurred.

[2] Appellants also sued several other prior owners and the former management company of the property; however, appellants conceded at oral argument that these defendants are not parties to this appeal because appellants' notice of appeal purports to appeal only the summary judgment in favor of appellee, individually and as Trustee of the Trusts, and was never amended to include the summary judgments in favor of the other defendants. Appellants have never moved this court to amend the notice of appeal. Accordingly, we dismiss appellants' second issue, which challenges the trial court's summary judgment as it relates to the former management company,

2

Appellants brought claims against appellee and the other prior owners for negligence, premises liability, negligence per se, and negligent activity. Appellants alleged as support for their negligence, premises liability, and negligent activity claims that appellee and the other prior owners failed to disclose to the current owner and appellants, or actively concealed, or both, (1) the level of criminal activity regularly occurring at the property, (2) that the Dallas S.A.F.E. unit[3] had the property under ongoing review,[4] and (3) that there were not sufficient locks, security devices, or both on the units' doors, specifically unit 411. They also alleged that appellee and the other prior owners were responsible for allowing crime on the property to escalate to such a level that it posed an unreasonable risk to tenants and guests. In support of their negligence per se claim, appellants contended that appellee violated Texas Property Code section 92.153(a)(5), which requires all front doors of apartment

and we dismiss the remainder of appellants' issues to the extent they challenge the summary judgments in favor of any of the prior owners other than appellee. *See* Tex. R. App. P. 25.1(b), 43.2(f).

[3] This unit of the Dallas Police Department works to reduce crime by meeting with owners and giving them notice about crime occurring on their properties.

[4] Appellants also alleged that appellee and the other prior owners failed to forward to the property's management company documents from the S.A.F.E. unit that appellee and the prior owners received after they had already transferred ownership of the property.

units to be equipped with a keyless bolting device. Tex. Prop. Code Ann. § 92.153(a)(5) (Vernon 2007). They pled for actual damages as well as exemplary damages.

Appellee filed a traditional motion for summary judgment on the following grounds: (a) he cannot be liable in his individual capacity because he held no interest in the property in that capacity, only through the Trusts; (b) as Trustee of the Peter A. Zarcades Separate Property Trust, he owned only an 11.56% minority interest in the property; as Trustee of the Trust Indenture of Peter A. Zarcades and Sandra Rae Zarcades, he owned only a 13.44% interest; each of the Trusts was in the chain of title of the property for only fifteen days; and both Trusts sold their interests in the property over six months before the crime occurred; (c) appellants cannot prove proximate cause because the Trusts' ownership of the property is too remotely connected with appellants' alleged injuries when the evidence shows that a prior manager of the property remained as manager after the property transfer; (d) no act or omission of appellee contemporaneously caused appellants' injuries; (e) according to courts of appeals who have considered section 353 of the Restatement (Second) of Torts, relied on by appellants, it does not apply when the purchaser of land discovers or should have discovered the dangerous condition; thus, appellee did not have any duty to disclose any alleged dangerous condition; (f) appellee did

4

not have any duty to disclose any alleged dangerous condition because neither he nor the Trusts exercised possession or control of the property; (g) appellee was not a landlord in any of the pled capacities; and (h) appellants are not entitled to exemplary damages because appellee owed no duty to appellants, committed no act or omission that proximately caused appellants' alleged injuries, section 41.005 of the civil practice and remedies code prohibits exemplary damages based on a third party's crime, and no exception applies. Tex. Civ. Prac. and Rem. Code Ann. § 41.005 (Vernon 2008).

The trial court granted summary judgment in appellee's favor. Appellee then moved to sever the summary judgment from the remainder of the suit; the trial court granted the motion, thus making the summary judgment against appellee final and appealable. Appellants timely filed a notice of appeal challenging the judgment in appellee's favor.

**Standard of Review**

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every

5

reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798.

**Appellants' Negligence, Premises Liability, and Negligent Activity Claims**

In his motion for summary judgment, appellee contended that appellants' negligence, premises liability, and negligent activity claims all fail because appellants cannot prove that as a prior owner of the property, appellee owed any duty to appellants. Appellants challenge summary judgment on this ground in their first and fourth issues.

**Applicable Law**

Tort liability depends on both the existence and violation of a duty. *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Whether a duty exists is a question of law for the court to decide under the facts surrounding the occurrence in question. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez,* No. 07-0091, 2008 WL 3991185, at *2 (Tex. Aug. 29, 2008); *Lefmark*, 946 S.W.2d at 53.

Generally, a landowner has no duty to protect another from the criminal acts of third parties who are not subject to the premises occupier's control. *Trammell Crow,* 2008 WL 3991185, at *2; *Lefmark*, 946 S.W.2d at 53; *Allen v. Rogers*, 977 S.W.2d 733, 735 (Tex. App.—Fort Worth 1998, pet. denied).

6

But this rule is not absolute; a person who occupies or controls premises has a duty to use ordinary care to protect invitees, including tenants, from criminal acts of third parties if he or she knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee. *Trammell Crow,* 2008 W.L. 3991185, at *2; *Lefmark*, 946 S.W.2d at 53; *Allen*, 977 S.W.2d at 735–36. This duty is commensurate with the right of control over the property. *Lefmark*, 946 S.W.2d at 53–54. Thus, a landlord owes such a duty to a tenant when the landlord has retained the right to control part of the leased premises. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993); *Allen*, 977 S.W.2d at 736. Prior owners of property normally owe no duty to keep a property safe after transfer because they no longer exercise such control. *Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 571 (Tex. App.—Eastland 2000, pet. denied); *see Lefmark*, 946 S.W.2d at 54. Thus, for a prior property owner to owe a duty to a tenant, that duty must arise under an exception to the general rule. *Lefmark*, 946 S.W.2d at 54; *Kelly*, 27 S.W.3d at 571.

Here, appellants contend that appellee created a dangerous condition on the property, an exception to the general rule that a prior owner owes no duty to keep property safe. *See Lefmark*, 946 S.W.2d at 54; *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986). They also contend that an exception

7

applies under section 353 of the Restatement (Second) of Torts[5] because appellee concealed or failed to disclose matters involving an unreasonable risk to persons on the property. *See Kelly*, 27 S.W.3d at 571.

---

[5] Section 353 provides as follows:

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

Restatement (Second) of Torts § 353 (1965).

The Texas Supreme Court has expressly stated that it has not adopted Section 353 as the law of Texas even though several courts of appeals have cited and relied upon it. *Kelly*, 27 S.W.3d at 571; *see Lefmark*, 946 S.W.2d at 54. Thus, although we will analyze whether appellants' reliance on section 353 would defeat summary judgment in this case, we express no opinion as to whether it has been adopted as the law of Texas.

8

**Appellee's Summary Judgment Evidence**

As summary judgment evidence, appellee attached his affidavit, to which he attached special warranty deeds conveying an 11.56% ownership interest in the property to Peter A. Zarcades, Trustee under the Peter A. Zarcades Separate Property Trust and a 13.44% ownership interest in the property to Peter A. Zarcades, Trustee under the Trust Indenture of Peter A. Zarcades and Sandra Rae Zarcades. Both deeds were filed in the Dallas County property records on June 17, 2004. Appellee also averred that in his capacity as Trustee for the Trusts, he transferred both property interests on July 2, 2004, fifteen days later.

Appellee further averred that

[a]t no time did [he] or anyone associated with the Trusts ever participate in any manner whatsoever in the management, maintenance, supervision, control, operation, or decision making with respect to the Property in any way. The interests were purchased by the respective Trusts as an investment without an intention to occupy, possess, manage or control the Property in any way.

I was never advised nor saw any documentation of any conditions (dangerous or otherwise) with respect to the Property. I did not inspect the Property. I did not know of any crime levels or statistics and was never advised of any criminal activities on the Property whatsoever. I did not know and did not investigate the existence of any security devices on the Property such as locks, fences, gates or the condition of doors present on the Property or leading to any apartment unit. I had no authority, was not

9

involved, and did not receive any information regarding security of the Property or safety decisions with respect to the Property.

Appellee also presented as summary judgment evidence the deposition testimony of Phyllis Brown, the on-site property manager for appellee and the other prior owners, who continued on with the new management company after title was transferred to the current owner. When asked to describe the security measures in place at unit 411, Brown answered, "Deadbolt lock, adequate lighting in the breezeways, Charley Bar[6] with a pin screw, keyless entry and alarm." She explained that a "keyless entry" is a lock that locks from the inside. She confirmed that the unit had a peephole. She also testified that before January 26, 2005 (the date of the crime), an audit check of security measures at the complex was done every other month.

When asked how things at the property changed after it was sold in July 2004, she said, "The make-ready process, the needs for the property. . . . We were able to get things that we needed for the property." She elaborated further, stating that after the sale, the access gates were upgraded so that an access card, rather than just a code, was needed to open them, and that the outside lighting and the units were upgraded. Before January 26, 2005, she sent a flyer to the tenants advising them that the apartments had a new alarm

---

[6] A Charley Bar is a metal bar that goes across a sliding glass door.

10

company.  After January 26, 2005, the new owner replaced the door jamb on unit 411.

Brown also testified that she routinely received the statistics of criminal activity occurring on the property from the Dallas Police Department and daily reports from Olde Forge, the security company for the apartments.  She did not specifically request the reports from the Dallas Police Department; the Department offered them to her.  She also said that from July 2004 until the date of the deposition, the new owners did not require a criminal activity status and crime summary for the property.  Before January 26, 2005, Olde Forge's reports did not include specific crimes, only "disturbances . . . [n]oise violations, outside drinking, children out past curfew."

When asked to tell every action she or her employer or the owners[7] took to prevent a crime such as the one that occurred involving appellants, Brown answered, "I notify my residents of anything that I've heard that's taking place in the area.  I make additional locks, the screw-type locks available if that's what they need."  When asked what security measures were in place for trespasser control on or about January 26, 2005, Brown answered, "[S]ignage that says, no trespassing.  Olde Forge would stop anybody that's walking

---

[7] The question does not specify whether it refers to the prior owners and management company or the current owner and management company.

11

through to try to identify. If he noticed something suspicious, then he would approach them, and this is an assessment that I'm making based on my reports." Olde Forge's security consisted of a roving patrol in a vehicle.

Brown knew of three or four apartment burglaries at the complex in the year prior to the crime in which "possibly an apartment was broken into or something was stolen," and six or seven vehicle break-ins. When asked whether, based upon her past experience at the property, Brown thought there was a likelihood that criminal conduct of a similar nature might occur sometime in the future, she said no. When asked why, she stated that "[i]t's a different place since the property was sold. . . . More care has gone into the property. A lot of the issues I had when I initially got there, it doesn't have . . . ."

Brown explained that "[i]nitially, when [she] went to work there, [she] had young people hanging out, maybe hanging out in the breezeway, inadequate lighting, walking through at will, things like that." But after July, "[w]e check you out thoroughly. There's a screening process that . . . not only brings up your credit history but also your criminal background as well." Before July, a similar but not as thorough procedure was in place to do such checks, but it only gave "basic information as far as credit history."

12

**Appellants' Summary Judgment Evidence**

In response to the summary judgment motions of all the prior owners, appellants presented deposition testimony from Emory Nash, a Dallas police officer who at one time worked with the S.A.F.E. unit; deposition testimony and an affidavit from appellant Glover; deposition testimony from Anthony Wonderly, an area supervisor with the new apartment management company; copies of correspondence issued to the prior owners from the City of Dallas; and excerpts from the Purchase and Sale Agreement between the prior owners and the new owners.

Nash testified that when he worked with S.A.F.E., he was assigned to the Southeast Bureau, which includes the Skyline Place Apartments. S.A.F.E. initiates an investigation into crime statistics for a property after receiving citizen complaints about the property; if there have been enough "abatable incidents" within the past twelve months, the unit "assemble[s] a team to go out [to the property] and . . . inspect the units and . . . look for also code and fire violations to make sure the property is up to city code."

Attached to Nash's deposition excerpt is a copy of a June 15, 2005 letter from the S.A.F.E. unit addressed to Skyline Place Apartments, at the address for the former management company, BNC Real Estate Accounting, 13151 Emily Road Suite 250, Dallas, Texas 75240-8941. The letter states that

13

"[p]ublic records indicate that [the addressee] is the (*property owner, landlord, or person in control*) of the property" and indicates that it is for the purpose of informing BNC of the criminal activity occurring on the property.  The letter goes on to state that the S.A.F.E. unit had received a complaint alleging that the property is a criminal nuisance site and that since a May 25, 2004 meeting,[8] there had been one reported kidnapping, one drug arrest as a result of a traffic stop, one "strong arm" robbery, three aggravated robberies, five aggravated assaults, and two aggravated sexual assaults at the property.  The letter also warned of the penalties for failing to abate such a criminal nuisance.

Also attached to the deposition excerpt was a Location Review by the S.A.F.E. unit, listing all of the criminal activity on the property from June 10, 2003 to June 9, 2005 and detailing the S.A.F.E. unit's involvement with the property from May 10, 2004 until June 15, 2005, the date of the report.  The report shows that on June 24, 2004 and July 28, 2004, Officer Nash inspected the property and found no abatable criminal activity; however, between July 28, 2004 and June 15, 2005, after the property had been sold and the new management had taken over, there were at least five aggravated assaults, one

---

[8] This meeting was between Officer Nash and the property's maintenance man, who was authorized by the management company to attend.

14

family violence assault, one sexual assault, two aggravated sexual assaults (the crime at issue here), one kidnapping, two drug arrests, four aggravated robberies (two of which involved the crime at issue here), one report of indecency with a child, and a report of random gunfire in the area.

In her affidavit, Glover averred that her lease, attached to the affidavit, states that the apartments were required by law[9] to have a peephole on each exterior door and a keyless bolting device on each door and that there was no keyless deadbolt lock on her front door the entire time she was a tenant, including when the crime occurred. She stated that the intruder who sexually assaulted her kicked in the front door. Also attached to her affidavit are photocopies of photographs of the apartment door, which are of poor quality in the clerk's record. In her deposition excerpt, Glover testified that there was only one lock on her unit's door, and it was a "keyhole lock," not a "big bolt lock." She said she complained to someone named Aeysha[10] "months before the accident" about the lack of a keyless deadbolt, but not in writing.

In Wonderly's deposition excerpt, he testifies that on November 5, 2004, the current owners and manager felt that they had complied with the lease

---

[9] The actual language of the lease states that such devices are required by Texas law, "with some exceptions."

[10] Aeysha is not identified in the record.

15

terms and that unit 411 did have a keyless bolting device on the exterior door. He said that it "would seem to be the only unit in the entire [318 unit] complex that did not." Before the current owners purchased the property, he personally walked through all the vacant units, about one hundred, and randomly selected about one hundred occupied units to walk through as well. According to Wonderly, he did not discover any units missing the proper locks.

Wonderly further testified that he had "confirmed" only recently (as of the date of the deposition) that unit 411 did not have a keyless deadbolt or peephole on January 26, 2005, the date of the crime. He checked all 317 other units after that and there were no other locks missing. Wonderly explained that Brown, the property manager, told him the day of the crime that the door might possibly have been missing the required lock and peephole; however, before he could confirm the truth of this statement, the maintenance crew had already repaired the door with the correct locks. Neither Wonderly nor Brown ever saw the door without the required locks. He did not get to see the interior of the door until "months later after the residents no longer occupied the unit."[11]

---

[11] Wonderly's testimony is somewhat ambiguous as to whether, after he was able to see inside the unit, he confirmed that it did not have the required lock or whether it already had the required lock when he was able to view the inside door. However, because we must construe the summary

Wonderly additionally testified that he was not aware that the apartments were being reviewed by the S.A.F.E. unit until April or May 2005 because the City "had been sending all their documents to the previous owners who never gave us any information . . . or told us that we were even involved in that." However, he had never requested a security survey or assessment of the property; he had only visually surveyed the property. Wonderly stated that Brown told him she had been told by "her previous owners not to talk negative about the property." When he talked to her before she went to work for the new management company, she told him, "every property has some problems; we have ours." Once she was hired by the new company, Brown asked them for help with "car beak-ins and all and additional," which is why they "additionally got Olde Forge Security right away." However, Brown never informed Wonderly about the level of crime occurring at the property in 2003 and 2004.

The three letters attached as summary judgment evidence are dated May 25, 2004 and April 26 and 28, 2005 and are addressed to entities other than

---

judgment evidence in appellants' favor, we will construe Wonderly's testimony to mean that after he was able to see the inside of the door, he was able to confirm that it did not have the required lock. *See IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798.

appellee.[12]  The April 26 letter details the S.A.F.E. unit's activity regarding the property since May 19, 2004 and notes that no one contacted the S.A.F.E. unit as was requested on May 25, 2004.  The letter also notes that criminal activity at the property had continued since May 25, 2004 and warns that the City could take legal action against the owners for failing to abate the criminal activity on the property.  The second, April 28, 2005 letter appears to be identical to the April 26, 2005 letter.  The May 25, 2004 letter is similar to the June 15, 2005 letter attached to appellee's summary judgment motion.

Also attached is a copy of excerpts from the Purchase and Sale Agreement for the property, which contain the various representations and warranties from the prior owners to the purchaser,[13] including a representation and warranty that

> [e]xcept as disclosed on the Rent Roll, with respect to each Tenant:
> (i) . . . no uncured breach or default of a material nature exists on
> the part of the Landlord or Tenant thereunder [with respect to any

---

[12]⬓ The April 2005 letters are addressed to Skyline Apartments/BNC Real Estate, BNC Skyline, L.P., and BNC Inwood, LLC, at the same address on Emily Road to which the June 15, 2005 letter was sent.  They are also addressed to BNC Inwood, LLC, Attention: Barry S. Nussbaum, at an address in California. The May 25, 2004 letter is addressed to Skyline Place Apartments at the Emily Road address.

[13]⬓ The purchaser is listed as Chandler Wonderly and indicates that Wonderly intended to assign his rights as purchaser to a third party.

18

lease and]; (ii) the Landlord has no obligation to construct, install, or repair any improvements or facilities for such Tenant.

In addition, the agreement contains a representation and warranty that "[t]here are no actions, suits, claims, assessments, condemnation proceedings, violations of any laws, rules, or regulations of any governmental authority or property association, or proceedings pending or threatened, that could materially adversely affect the ownership, operation or maintenance of the Property or Seller's ability to perform" under the agreement.

**Analysis**

Appellee specifically averred that he had no knowledge of the crime activity occurring at the property and that he did not receive any information regarding such activity. Appellants' evidence does not contradict appellee's affidavit testimony, especially considering that none of the S.A.F.E. unit letters in evidence were addressed to appellee in any capacity and that appellee, as Trustee of the Trusts, owned interests in the property for a mere fifteen days. Additionally, there is no evidence that any of the prior owners to whom the letters were addressed shared this information with appellee.

There is likewise no evidence that any criminal activity occurred during or immediately before or after the short time the Trusts, through appellee, owned their minority interests in the property. While it might be argued that

19

appellee could have obtained information regarding the crime activity on the property and performed a more thorough due diligence review of the property, appellants have cited no authority requiring a prospective property owner to do so. *See Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d 749, 759 (Tex. 1998) ("Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area."). And, considering that appellee's address is in San Diego, California and that he averred that he had never inspected the property or intended to occupy or possess it, appellants did not present any evidence that appellee should have known of the amount and type of crime occurring at the apartments. The evidence does not show how appellee could have created or contributed to a dangerous condition over a two-week period when, as Trustee of the Trusts, the level of crime activity existed, without his knowledge, at the time he bought his interests in the property and continued at roughly the same rate after he sold his interests two weeks later. Accordingly, we conclude and hold that appellee, individually and as Trustee of the Trusts, conclusively proved that he had no duty to appellants to protect them from third-party criminal acts occurring at the property, especially as of January 26, 2005. *See Lefmark*, 946 S.W.2d at 55. Thus, the trial court did not err by granting appellee summary judgment on appellants' negligence, premises liability, and negligent activity claims.

We overrule appellants' first and fourth issues.

## Appellants' Negligence Per Se Claim

In their fifth issue, appellants claim that the trial court erred by granting summary judgment for appellee on all of their negligence and premises liability claims, including their negligence per se claim, because appellee failed to conclusively prove the absence of proximate cause. Appellants' negligence per se claim is based on their contention that appellee and the other prior owners violated Texas Property Code 92.153(a)(5) by failing to install a keyless deadbolt on unit 411 at the owners' expense. Tex. Prop. Code Ann. § 92.153(a)(5).

### Applicable Law

Negligence per se is a concept adopted by the civil courts in which a duty is based on a standard of conduct created by a statute rather than on the reasonably prudent person test used in pure negligence claims. *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 839 (Tex. App.—Fort Worth 2006, no pet.) (op. on reh'g.). In such a case, the factfinder is not asked to decide whether the defendant acted as a reasonably prudent person would have acted under the same or similar circumstances; instead, the statute itself states what a reasonably prudent person would have done. *Omega Contracting*, 191 S.W.3d at 839;

21

*Supreme Beef Packers, Inc. v. Maddox*, 67 S.W.3d 453, 455 (Tex. App.—Texarkana 2002, pet. denied). If an excuse is not raised, the only inquiry for the factfinder is whether the defendant violated the statute and, if so, whether the violation was a proximate cause of the injury. *Omega Contracting*, 191 S.W.3d at 839; *Supreme Beef Packers*, 67 S.W.3d at 455.

Proximate cause has two components: cause-in-fact and foreseeability. *LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 688 (Tex. 2006); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *Wrenn v. G.A.T.X. Logistics, Inc*., 73 S.W.3d 489, 496 (Tex. App.—Fort Worth 2002, no pet.). These elements cannot be established by mere conjecture, guess, or speculation. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *Doe v. Boys Clubs of Greater Dallas, Inc*., 907 S.W.2d 472, 477 (Tex. 1995). The test for cause-in-fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Urena*, 162 S.W.3d at 551; *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003); *Brumfield v. Ruyle*, No. 02-06-00037-CV, 2007 WL 1018475, at *6 (Tex. App.—Fort Worth Apr. 5, 2007, no pet.). If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause-in-fact. *Urena*, 162 S.W.3d at 551; *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799. In other words, the conduct of the defendant may be too attenuated from the

22

resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 799; *Arguelles v. Kellogg Brown & Root*, 222 S.W.3d 714, 731 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In determining whether criminal conduct is foreseeable, we must consider whether any criminal conduct previously occurred on or near the property, how recently the criminal conduct occurred, how often it occurred, how similar it was to the conduct at issue, and what publicity was given to the previous conduct to indicate that the premises owner knew or should have known about it. *Timberwalk*, 972 S.W.2d at 757. "These factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable. . . . The court must weigh the evidence using all the factors." *Id*. at 759; *Trammell Crow,* 2008 WL 3991185, at *4.

**Analysis**

Appellee contends that his failure to ensure that the door had a keyless bolting device and peephole during the fifteen days he owned interests in the property as Trustee of the Trusts is too remotely attenuated from appellants' injuries six months later. The record shows that there were several assaults, sexual assaults, and robberies at the apartments around the time appellee

23

acquired his interests in the property as Trustee of the Trusts.  There is no evidence as to whether any of these crimes were similar to the one here, i.e., that anyone kicked in a door to get into one of the units or that any of the assaults, sexual assaults, or robberies were facilitated by the lack of a locking device on any of the doors. *See Trammell Crow,* 2008 WL 3991185, at *6–7. Moreover, it is undisputed that appellee did not have personal knowledge about the frequency and type of crime occurring at the property or the types of security devices that were or were not on Glover's door.  Appellants do not dispute the evidence that Glover's door was apparently the only one in the complex lacking a keyless deadbolt.  And, as we have already discussed previously, there is no evidence that appellee ever received notice of the letters written by the S.A.F.E. unit regarding the criminal activity on the property.[14] *See Timberwalk*, 972 S.W.2d at 759 ("Previous similar incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred.").  Accordingly, we conclude and hold that appellee conclusively proved that his alleged negligence (whether based on appellants' pled negligence, negligence per se, or premises liability claims) could not have

---

[14] Likewise, there is no evidence as to the identity of Aeysha, the person to whom Glover said she complained about the lack of a deadbolt, and no evidence that Aeysha ever conveyed or had a duty to convey this information to appellee.

24

been a proximate cause of appellants' injuries and therefore that he was entitled to summary judgment on appellants' negligence per se cause of action as well. We overrule appellants' fifth issue.[15]

## Exemplary Damages

Appellants contend in their sixth issue that the trial court erred by granting summary judgment as to their claim for exemplary damages. However, because we have determined that the trial court did not err by granting summary judgment as to all of appellants' independent tort claims, we also hold that it likewise did not err by granting summary judgment as to damages flowing from those claims. *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993) (holding that recovery of exemplary damages requires finding of independent tort and accompanying damages); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.). We overrule appellants' sixth issue.

## Sanctions

---

[15] Because appellants' negligence per se claim fails as to the proximate cause element, we need not address appellants' third issue contending that appellants are within the class of persons whom section 92.153(a)(5) was designed to protect. *See* Tex. R. App. P. 47.1; *Holt v. Reproductive Servs., Inc.*, 946 S.W.2d 602, 607 (Tex. App.—Corpus Christi 1997, writ denied).

Appellee has asked this court to impose sanctions on appellants, contending that this appeal is frivolous. *See* Tex. R. App. P. 45. Under rule 45, this court may award just damages to a prevailing party if it determines that an appeal is frivolous. *Id.*; *Clopton v. Pak*, 66 S.W.3d 513, 517 (Tex. App.—Fort Worth 2001, pet. denied). Whether to award damages is within this court's discretion. *Clopton*, 66 S.W.3d at 517. Sanctions should be imposed only in egregious circumstances. *Id.*; *Angelou v. African Overseas Union*, 33 S.W.3d 269, 282 (Tex. App.—Houston [14th Dist.] 2000, no pet.). We do not believe that this case warrants sanctions; therefore, we decline to impose monetary sanctions under rule 45.

### Conclusion

Having overruled in part and dismissed in part appellants' dispositive issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED: October 30, 2008

26