Affirmed and Opinion filed February 19, 2009








Affirmed
and Opinion filed February 19, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00358-CV

_______________

 

TRACY MAYER, AS NEXT FRIEND OF TYLER LEE MAYER, A
MINOR, DIANE MESSIMER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF SHAUN MESSIMER, DECEASED, AND KATHLEEN AND SALVATORE M. CIARAMITARO,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES OF THE ESTATE OF MICHAEL
CIARAMITARO, DECEASED, Appellants

 

V.

 

WILLOWBROOK PLAZA LIMITED PARTNERSHIP d/b/a
WILLOWBROOK PLAZA, PPG VENTURE I LIMITED PARTNERSHIP, ERMC, ERMC LP, ERMC LP
d/b/a ERMC SECURITY, ERMC II, LP d/b/a ERMC SECURITY, CBL/GP, INC., CBL & ASSOCIATES,
INC., CBL & ASSOCIATES PROPERTIES, INC., CBL & ASSOCIATES LIMITED
PARTNERSHIP, AND CBL & ASSOCIATES MANAGEMENT, INC., Appellees

                                                                                                                    
                           

On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2004-73159-A

                                                                                                                                   
            

 

O P I N I O N

This appeal addresses defense summary
judgments granted in wrongful death and survival actions brought by appellants,
Tracy Mayer, as next friend of Tyler Lee Mayer, a minor; Diane Messimer,
individually and as personal representative of the estate of Shaun Messimer,
deceased; and Kathleen and Salvatore M. Ciaramitaro, individually and as
personal representatives of the estate of Michael Ciaramitaro, deceased.  We
affirm. 

Overview

Syna John Heng shot and killed
Michael Ciaramitaro and Shaun Messimer after a confrontation in the parking lot
of the Willowbrook Plaza shopping center in the early morning hours of February
2, 2003.  The decedents= family members filed wrongful death and survival actions
against numerous defendants including ERMC II, LP (AERMC II@); Willowbrook Plaza Limited
Partnership d/b/a Willowbrook Plaza (AWillowbrook Plaza@); PPG Venture I Limited Partnership
(APPG Venture@); and CBL & Associates
Management, Inc. (ACBL@).  See Tex. Civ. Prac. & Rem. Code Ann. '' 71.002, 71.021 (Vernon 2008).  They
predicated their actions on a negligent activity theory and a premises defect
theory.

ERMC II provides security for the
shopping center.  Willowbrook Plaza owns the land.  PPG Venture owns the
buildings and improvements.  CBL manages the shopping center and serves as its
leasing agent.             








The trial court granted summary judgment
in favor of the defendants.  Appellants contend the trial court erred in
granting summary judgment because defendants failed to negate appellants= negligent activity theory as a
matter of law.[1]  With respect
to their premises defect claim, appellants contend that defendants failed to
(1) establish that the shooting was not foreseeable; (2) establish that
decedents were not invitees or licensees; (3) negate the necessary elements to
establish liability for claims by invitees or licensees; and (4) establish that
decedents were trespassers. 

Factual Background

Ciaramitaro and Messimer worked at
Babin=s Seafood House restaurant in the
Willowbrook Plaza shopping center.  After completing their shifts around
midnight, Ciaramitaro and Messimer drove to a Bennigan=s restaurant located in the
Willowbrook Plaza shopping center across the parking lot from Babin=s.  They socialized with Torry
Davison and Monica Valadez at Bennigan=s.  About two hours later, the four
left Willowbrook Plaza shopping center together in Davison=s car and drove to a party at the
Omni Hotel.  They left Ciaramitaro=s and Messimer=s cars behind in the Willowbrook
Plaza parking lot. 

The group returned to the Willowbrook
Plaza parking lot between 4:00 a.m. and 5:00 a.m. on February 2, 2003 to
retrieve the cars they had left.  ERMC II did not patrol the parking lot at
this time.  Under the contract signed by ERMC II and CBL, ERMC II patrolled the
shopping center parking lot only during Anormal business hours.@  The shopping center=s Anormal business hours@ did not extend past Bennigan=s 2:00 a.m. closing time.

As Davison pulled into the parking
lot, he observed 18-year-old Syna John Heng sitting in the driver=s seat of Messimer=s car.  Heng=s car was parked next to Messimer=s car.  Davison drove up to Messimer=s car; Davison, Ciaramitaro, Messimer
and Valadez then exited Davison=s car.  Davison grabbed a softball bat from his trunk while
Messimer walked over to his car.  The driver=s side window of Messimer=s car had been broken, and Heng was
sitting in the driver=s seat attempting to start the car.  Messimer pulled Heng out
of his car and began punching him. Messimer and Heng exchanged words as
Messimer continued punching Heng.  Messimer knocked Heng to the ground several
times.  

During the confrontation between
Messimer and Heng, 14-year-old Avignon Yin had been sitting in Heng=s car.  Yin exited Heng=s car and stood passively while
Ciaramitaro and Davison watched him closely.  Messimer later grabbed Yin and
punched him several times.








While Messimer was punching Heng,
Davison used the softball bat to break a window of Heng=s car.  Messimer eventually stopped
punching Heng and proceeded to smash the windows, kick the fenders, tear off
the plastic bumper, and slash the tires of Heng=s car.  Messimer took Heng=s and Yin=s wallets, removed their identification
cards, and handed the wallets to Valadez.  Finally, Messimer told Heng and Yin
to leave on foot.  Heng and Yin walked around Bennigan=s, out of the group=s view. 

After Heng and Yin left, Messimer
used his cell phone to call his grandmother and tell her about the incident. 
Ciaramitaro began removing the wheel rims and tires from Heng=s car.  Davison removed the CD player
from Heng=s car and put it in his own car. 

Heng returned with a handgun
approximately three minutes after leaving, walked up to Messimer, and shot him
in the chest.  Messimer fell to the ground and attempted to crawl away.  Heng
followed and shot him again in the back.  As Davison and Valadez ran for cover,
Ciaramitaro ran to his car and got inside.  Heng walked over to Ciaramitaro=s car and shot him through the window
three times.  Davison used his cell phone to call 9-1-1 while hiding in the
bushes.

Heng then approached Valadez, who was
crouching on the opposite side of Messimer=s car; pointed his gun at her; and
demanded his wallet.  Finding his identification missing from his wallet, Heng
demanded that Valadez give it to him.  Valadez told Heng that she did not have
his identification.  Heng searched Messimer=s car and the ground outside the car,
but did not find the identification.  Heng and Yin then got into Heng=s car and drove away on the rims. 
Police arrived moments later.  Heng and Yin were arrested and charged in
connection with the deaths of Messimer and Ciaramitaro.

Procedural Background








On December 29, 2004, Tracy Mayer, as
next friend of Tyler Lee Mayer, a minor, and Diane Messimer, individually and
as personal representative of the estate of Shaun Messimer, deceased, filed a
wrongful death and survival action asserting negligence and gross negligence
against multiple parties including the above-named appellees.  Kathleen and
Salvatore M. Ciaramitaro, individually and as personal representatives of the
estate of Michael Ciaramitaro, deceased, also filed a wrongful death and
survival action against multiple parties including the above-named appellees on
January 25, 2005, alleging that appellees= negligence caused the decedents= deaths.

Mayer and Diane Messimer filed their
second amended petition on June 21, 2006.  They effectively nonsuited all
previously named defendants C except, as relevant to this case, Willowbrook Plaza Limited
Partnership, CBL/GP, Inc., PPG Venture I Limited Partnership, ERMC, ERMC II,
LP, and CBL & Associates Management, Inc. C by deleting them from their live
pleading.  See Randolph v. Walker, 29 S.W.3d 271, 274 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied) (AWhen a party=s name is omitted from an amended pleading, he is as
effectively dismissed as where a formal order of dismissal is entered.@) (internal citations omitted); Wren
v. Tex. Employment Comm=n, 915 S.W.2d 506, 508 (Tex. App.CHouston [14th Dist.] 1995, no writ) (ADropping a defendant from a pleading
serves to nonsuit that defendant.@). Mayer and Diane Messimer pleaded
both premises defect and negligent activity claims. 

The Ciaramitaros filed their third
amended petition on June 13, 2006.  They, too, effectively nonsuited all
previously named defendants C except, as relevant to this appeal, Willowbrook Plaza
Limited Partnership, PPG Venture I Limited Partnership, ERMC II, LP d/b/a ERMC
Security, and CBL & Associates Management, Inc. C by deleting them from their live
pleading.  See Randolph, 29 S.W.3d at 274; Wren, 915 S.W.2d at
508.  The Ciaramitaros pleaded both premises defect and negligent activity
claims.

CBL, CBL/GP, Inc., ERMC, and ERMC II
filed combined traditional and no-evidence summary judgment motions.  PPG
Venture and Willowbrook Plaza filed no-evidence summary judgment motions. 
After appellants responded to the summary judgment motions, CBL, ERMC, ERMC II,
Willowbrook Plaza, and PPG Venture filed a reply.








On January 16, 2007, the trial court
signed orders granting (1) Willowbrook Plaza=s no-evidence summary judgment
motion; and (2) CBL/GP, Inc.=s and CBL=s combined traditional and no-evidence summary judgment
motions.  On January 18, 2007, the trial court signed orders granting (1) ERMC
and ERMC II=s combined traditional and no-evidence summary judgment motion; and (2)
PPG Venture=s no-evidence motion for summary judgment.

The trial court signed an order on
March 19, 2007, severing and abating appellants= claims against Syna John Heng and
Avignon Yin.  This severance order made the trial court=s prior summary judgment orders final
and appealable.  See, e.g., Park Place Hosp. v. Milo, 909 S.W.2d
508, 510 (Tex. 1995).  Appellants timely appealed.[2] 


Standard of Review

An appellate court applies de novo
review to a grant of summary judgment, using the same standard that the
trial court used in the first instance.  Valence Operating Co. v. Dorsett,
164 S.W.3d 656, 661 (Tex. 2005). A party may move for a traditional summary
judgment after the adverse party has appeared or answered, and may move for a
no‑evidence summary judgment after an adequate time for discovery has
passed.  Tex. R. Civ. P. 166a(a), (i).








A traditional summary judgment may be
granted if the motion and evidence show there is no genuine issue of material
fact and the movant is entitled to judgment as a matter of law.  Tex. R. Civ.
P. 166a(c).  In reviewing a summary judgment, we take as true all evidence
favorable to the nonmovant, indulge every reasonable inference in favor of the
nonmovant, and resolve any doubts in the nonmovant=s favor.  Sudan v. Sudan, 199
S.W.3d 291, 292 (Tex. 2006).  The movant must establish entitlement to summary
judgment on the issues expressly presented to the trial court by conclusively
proving all essential elements of the cause of action or defense as a matter of
law.  City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678
(Tex. 1979). 

A no‑evidence motion for
summary judgment must be granted if (1) the moving party asserts that there is
no evidence of one or more specified elements of a claim or defense on which
the adverse party would have the burden of proof at trial; and (2) the
respondent produces no summary judgment evidence raising a genuine issue of
material fact on those elements.  See Tex. R. Civ. P. 166a(i).  In reviewing
a no‑evidence motion for summary judgment, we view all of the summary
judgment evidence in the light most favorable to the non‑movant, Acrediting evidence favorable to that
party if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not.@  Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582
(Tex. 2006).  The non‑moving party is not obligated to marshal its proof,
but it is required to present evidence that raises a genuine fact issue on the
challenged element.  Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215
(Tex. 2002).

Analysis

A.        Overview
of Governing Legal Standards

1.         Wrongful
Death and Survival Actions

Appellants sued appellees for
wrongful death and survival claims arising from the February 2, 2003 shooting
deaths of Ciaramitaro and Messimer at the shopping center.  Under the Wrongful
Death Act, a decedent=s beneficiaries may bring an action if the decedent would
have been entitled to bring an action for the injury had the decedent lived.  Tex.
Civ. Prac. & Rem. Code Ann. '' 71.003(a), 71.004 (Vernon 2008).  To
advance a wrongful death claim, a plaintiff must be a child, parent, or the
spouse of the decedent.  Id.  ' 71.004.  Wrongful death claimants
sue to recover their own damages resulting from the decedent=s death.  See id.  ' 71.004; Goode v. Shoukfeh,
863 S.W.2d 547, 551 (Tex. App.CAmarillo 1993, no writ).








Section 71.021 provides for the
survival of a cause of action by which a decedent may have sought recovery for
personal injuries, pain and suffering, and other damages suffered before
death.  Id.  ' 71.021 (Vernon 2008);  Goode, 863 S.W.2d at 551. 
Survival claims are Awholly derivative@ of a decedent=s rights. Russell v.
Ingersoll-Rand Co., 841 S.W.2d 343, 345 (Tex. 1992). A survival action does
not create a new cause of action; it merely permits the decedent=s cause of action to survive the
decedent=s death.  Kramer v. Lewisville Mem=l Hosp. 858 S.W.2d 397, 404 (Tex. 1993). 

As part of their statutory wrongful
death and survival claims, appellants must establish that a wrongful act
occurred.  McCullough v. Godwin, 214 S.W.3d 793, 805 (Tex. App.CTyler 2007, no pet.); see also Tex.
Civ. Prac. & Rem. Code Ann. '' 71.002(b), 71.021.  Appellants
contend there are two wrongful acts at issue here: (1) negligent activity, and
(2) conduct giving rise to liability for premises defect.

2.         Negligent
Activity and Premises Defect

Negligent activity and premises
defect are independent theories of recovery.  Clayton W. Williams, Jr., Inc.
v. Olivo, 952 S.W.2d 523, 529 (Tex. 1997).  Recovery on a negligent
activity theory requires injury by or as a contemporaneous result of the
activity itself C not a condition created by the activity. Timberwalk Apartments,
Partners, Inc. v. Cain, 972 S.W.2d 749, 753 (Tex. 1998); Keetch v.
Kroger Co., 845 S.W.2d 262, 264 (Tex. 1992).  In contrast, a premises
defect theory requires an injury as a result of a condition of the premises.  Dukes
v. Philip Johnson/Alan Ritchie Architects, P.C., 252 S.W.3d 586, 592 (Tex.
App.CFort Worth 2008, pet. denied). 

A plaintiff must establish that the
defendant had control over and responsibility for the premises before liability
can be imposed.  See County of Cameron v. Brown, 80 S.W.3d 549, 556
(Tex. 2002).  The control must relate to the condition or activity that caused
the injury.  See Olivo, 952 S.W.2d at 528.  








A complaint that a landowner failed
to provide adequate security against criminal conduct by third parties
ordinarily is characterized as a premises defect claim.  Timberwalk, 972
S.W.2d at 753.  Duty remains a threshold inquiry in a premises defect claim,
and the scope of the duty owed to the claimant depends upon the claimant=s status when the incident at issue
occurred.  See W. Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex.
2005); Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995). 
Claimants traditionally have been classified as invitees, licensees, or
trespassers.  Dukes, 252 S.W.3d at 592.

An invitee enters land with the owner=s knowledge and for the mutual
benefit of both.  Am. Indus. Life Ins. Co. v. Ruvalcaba, 64 S.W.3d 126,
134 (Tex. App.CHouston [14th Dist.] 2001, pet. denied).  This category focuses on
whether a claimant had present business relations with the owner or possessor
of land at the time of injury that would make the claimant=s presence of mutual benefit.  Id.
at 135.  A claimant who was an invitee or had permission to enter a particular
portion of land can become a mere licensee or trespasser by using property on a
personal venture beyond the invitation=s scope.  Burton Constr. &
Shipbuilding Co. v. Broussard, 273 S.W.2d 598, 603 (Tex. 1954); see also
Peerenboom v. HSP Foods, Inc., 910 S.W.2d 156, 161 (Tex. App.CWaco 1995, no writ). 

A licensee enters and remains on land
with the owner=s consent and for the licensee=s own convenience, or on business
with someone other than the owner.  Ruvalcaba, 64 S.W.3d at 134.  In
contrast to invitees, licensees enter the premises solely for their own
purposes.  Peerenboom, 910 S.W.2d at 163.  Absent a relationship inuring
to the mutual benefit of the claimant and the owner, a claimant is classified
as a licensee.  Id.  A licensee who exceeds the rights and privileges
granted by the license becomes a trespasser.  Burton, 273 S.W.2d at 603;
see also Peerenboom, 910 S.W.2d at 163 (off-duty employee lost licensee
status on employer=s property and was a trespasser at the time of injury because
she entered an area of property beyond the scope of employer=s permission).  

A trespasser enters another=s property without lawful authority,
permission, or invitation.  Ruvalcaba, 64 S.W.3d at 134. 








The scope of the duty owed in a
premises defect case varies according to the claimant=s status as invitee, licensee, or
trespasser.  An owner or occupier of land must use reasonable care to protect
an invitee from known conditions that create an unreasonable risk of harm and
conditions that should be discovered by the exercise of reasonable care.  CMH
Homes, Inc. v. Daenen, 15 S.W.3d 97, 101 (Tex. 2000); Ruvalcaba, 64
S.W.3d at 134.  An owner or occupier of land must refrain from injuring a
licensee willfully, wantonly, or through gross negligence; the owner or
occupier who has actual knowledge of a dangerous condition unknown to the
licensee must warn of or make safe the dangerous condition.  Ruvalcaba,
64 S.W.3d at 134.  The only duty a premises owner or occupier owes to a
trespasser is the duty not to cause injury willfully, wantonly, or through
gross negligence.  Tex. Utils. Elec. Co. v. Timmons, 947 S.W.2d 191, 193
(Tex. 1997); Ruvalcaba, 64 S.W.3d at 135.

B.        Application
of Governing Legal Standards

1.         Negligent
Activity

We begin by addressing appellants= negligent activity theory as a
potential basis for  the wrongful act necessary to pursue their wrongful death
and survival actions.

a.         ERMC
II 

Although appellants pleaded both a
negligent activity theory and a premises defect theory against security company
ERMC II in the trial court, appellants disclaim on appeal any reliance on
premises defect against ERMC II.  Therefore, we address only the negligent
activity theory.

The trial court correctly granted
summary judgment to ERMC II on the negligent activity claim because ERMC II was
engaged in no activity C negligent or otherwise C when the decedents encountered Heng
in the shopping center parking lot.  It is undisputed that ERMC II=s parking lot patrol hours did not
extend to the period between 4:00 a.m. and 6:00 a.m.; all tenants were closed
at that time.  It is undisputed that ERMC II was not contractually required to
patrol at that time.








Appellants seek to establish a
negligent activity by positing that the absence of early morning parking lot
patrols violated a duty of care in the provision of security services. 
However, security companies such as ERMC II owe no generalized duty to provide
security services beyond their contract terms.  See Banzhaf v. ADT Sec. Sys.
Sw., Inc., 28 S.W.3d 180, 186 (Tex. App.CEastland 2000, pet. denied).  

In Banzhaf, two employees of a
sporting goods store were injured during a daytime store robbery.  Id.
at 183.  ADT Security Systems Southwest, Inc., provided the store=s alarm system, which was designed to
be activated only when the store was closed and empty of all employees.  Id.
at 184.  ADT did not provide daytime monitoring services and never responded to
daytime security matters at the store.  Id.  

The store employees sued ADT and
alleged several theories to support their contention that ADT owed a duty to
protect them against criminal acts by third parties.  Id. at 185.  They
claimed that ADT owed a contractual duty to the victims that Ais premised on an assumption that ADT=s being in the security business
required it to protect [the store=s] employees.@  Id.  The court concluded
that ADT provides security services only pursuant to contracts with its
customers.  Id.  The store selected the limited services it wished ADT
to provide; nothing in the contract created a duty to provide security services
beyond those selected.  Id.

The employees also contended that ADT
owed a duty under tort principles because (1) ADT had a duty to prevent
foreseeable crimes as a security company; and (2) violent crime against the
employee victims was foreseeable to those in the security business.  Id.
at 186.  The court refused to create a broad extra-contractual duty for
security companies:

Plaintiffs=
argument would shift the responsibility for protection against crime, without
any contractual basis, from law enforcement agencies to security companies. 
Purchasers are free to contract for the particular security devices and
services that they consider to be necessary.  We are not aware of any case
extending the duty of security companies beyond their contracts as suggested by
plaintiffs, nor have plaintiffs cited any.  ADT owed no duty to plaintiffs
based on tort principles.

Id.








Banzhaf =s analysis applies with equal force
here.  ERMC II=s contract required it to provide security only during Anormal business hours.@  The contract states that A[ERMC II] agrees to provide the
following which are subject to review and approval by CBL: . . . (a) work
schedule providing for sufficient coverage both inside and outside the premises
during its normal business hours.@  Deposition testimony establishes
that the shopping center=s Anormal business hours@ did not extend past 2:00 a.m., when
the last tenant closed.  Because ERMC II was not obligated to patrol the
parking lot or provide security beyond the time limit in its contract, ERMC II
owed no duty to provide security when the decedents encountered Heng between
4:00 a.m. and 5:00 a.m. on February 2, 2003.

Appellants assert that Shell Oil
Co. v. Khan, 138 S.W.3d 288, 295 (Tex. 2004), Aaffirmatively establishes that an
independent contractor, retained by the owner to provide security services, has
a duty to the plaintiff to conduct the security activities with ordinary care.@  Appellants further argue that Aapplying [Khan] to the facts
of this case establishes that ERMC II had the duty to exercise ordinary care
with respect to the security services it was providing@ at the shopping center.  Appellants
misplace their reliance on Khan.  

In Khan, Mohammed Khan was
employed by La Sani, Inc., at a gas station La Sani operated pursuant to a
lease and dealer agreement with Shell Oil Company.  Id. at 291.  He was
shot while cleaning the service-bay areas during his night shift.  Id. 
Khan sued Shell for negligence and asserted that Shell had a right to control
several security-related matters at the gas station, even though the dealer
agreement stated that La Sani was an independent contractor and Shell had no
right to control operations.  Id. at 292  

Khan addressed Shell=s liability for Khan=s shooting based on Shell=s overlapping roles as premises owner
and employer of an independent contractor.  Id. at 291.  To provide a
backdrop for the case and express its limited application, the court began by
stating: 








Once again, we consider when an oil company may be
held responsible for crimes committed by third parties against an employee of a
lessee-dealer.  In Exxon v. Tidwell, [867 S.W.2d 19, 20 (Tex. 1993),] we
held the answer >depends on whether the oil company possessed a right
of control over the safety and security of the station.=  As we were adopting a new standard, we remanded for
a new trial so the parties could present evidence directed to that standard. 
In this case, we apply that standard to the evidence presented.  Concluding
there is no evidence the oil company here had a right to control security or
premises conditions at the station, we reverse the court of appeals= judgment . . . . 

 

Id. (internal footnotes omitted).    

The court noted that Shell, like
Exxon, had overlapping roles and duties as (1) premises owner pursuant to a
lease, and (2) employer of an independent contractor pursuant to a dealer
agreement.  Id.  After analyzing whether Shell had a right of control
over the safety and security of the gas station, the court held that Shell had
no such right and owed no duty of care to Khan.  Id. at 295.  

Because the relationship between an
oil company and the station lessee is controlled by a lease and a dealer
agreement, the legal standards governing an oil company=s tort liability for injury to lessee
employees arise from an amalgam of landlord-tenant and agency principles.  See
Tidwell, 867 S.W.2d at 20-21.  A duty to the tenant attaches when the
landlord has the right of control over the leased premises; therefore, the
landlord owes the same duty of care to a tenant=s employee.  Id. at 21. 
Further, employers have a duty of ordinary care under the principles of agency
law to provide a safe workplace.  Id.  One who retains the right of
control over the work of an independent contractor also owes a duty of
reasonable care to the contractor=s employees.  Id.  The court
concluded that these principles gave rise to Aa hybrid body of law . . . governing
oil companies and their service station lessees.@  Id.  Consequently, the court
held that whether an oil company owes a duty of ordinary care to protect a
lessee=s employees from third-party criminal
acts depends on whether the oil company possesses a right of control over the
safety and security of the station.  Id. 








Viewed against this backdrop, Khan=s application of the Ahybrid@ principles Agoverning oil companies and their
service station lessees@ addressed a different issue focusing on whether Shell owed a
duty of care to its lessee=s employee.  Unlike Shell, ERMC II did not have overlapping
roles as premises owner and employer of an independent contractor.  Unlike La
Sani, ERMC II was not the decedents= employer.  ERMC II was neither the
premises owner nor the decedents= employer.  We conclude that Khan
does not control.  

Banzhaf=s analysis is the better fit here.  Banzhaf
confirms that security companies owe no generalized tort duty to the victim of
third party criminal acts beyond the governing contract terms.  See Banzhaf,
28 S.W.3d at 185-86.  Accordingly, we hold that the trial court
correctly granted ERMC II=s summary judgment motion. 

b.         Willowbrook
Plaza, PPG Venture, and CBL

We similarly hold that the trial
court correctly granted summary judgment to Willowbrook Plaza, PPG Venture, and
CBL because there was no ongoing activity by these appellees C negligent or otherwise C when the decedents returned to the
shopping center parking lot between 4:00 a.m. and 5:00 a.m. on February 2,
2003.                 

Additionally, we are not persuaded by
appellants= contention that Khan is applicable to these appellees. 
Appellants assert that Khan Ahas set forth the rule of law and the
standards to be applied in cases such as this where a plaintiff (who is a
tenant=s employee) is criminally assaulted
on the owner=s property, and where the landlord-owner has contracted to provide
security services.@  For the reasons discussed above, Khan does not apply
here because it focused on the Ahybrid body of law@ governing the particular
relationship between oil companies and gas station lessee-dealers.  And, in
further contrast to Khan, the decedents were not harmed by third-party
criminal activity at a time they were working as tenant employees.  They
indisputably were off duty when they returned to the parking lot and had been
off duty for at least four hours. 








As the Texas Supreme Court has
observed, claims predicated on an alleged failure to provide adequate
protection against criminal conduct by third parties ordinarily are analyzed in
terms of a premises defect rather than negligent activity.  Timberwalk,
972 S.W.2d at 753.  The ordinary rule applies here.  We conclude that
appellants cannot prevail on a negligent activity theory as a matter of law,
and therefore cannot establish the necessary wrongful act to pursue their
wrongful death and survival actions on that basis.  We overrule appellants= issues involving arguments based on
a negligent activity theory of liability.

2.         Premises
Defect

Having determined that appellants
cannot establish liability under a negligent activity theory, we turn to
appellants= premises defect theory against Willowbrook Plaza, PPG Venture, and CBL.[3]


a.         Decedents= status

The parties vigorously contest
whether the decedents were invitees when the shooting occurred.  The test for
determining invitee status is whether the decedents had present business
relations with the appellees at the time of injury that made their presence of
mutual benefit.  See Ruvalcaba, 64 S.W.3d  at 135.  Based on the record
before us, we conclude as a matter of law that the decedents were not invitees
when the shooting occurred.

It is undisputed that the decedents
were invitees when they originally parked their cars in the shopping center lot
before beginning their shift as employees at Babin=s, and when they parked their cars to
visit Bennigan=s as patrons.  It is undisputed that the decedents left the shopping
center parking lot with Davison and Valadez about two hours after arriving at
Bennigan=s to attend a party offsite at the
Omni Hotel.  It also is undisputed that no tenants were open when the decedents
returned to the shopping center parking lot to retrieve their cars between 4:00
a.m. and 5:00 a.m.  

Davison and Valadez testified that
neither they nor the decedents intended to conduct business at the shopping
center upon returning to the parking lot that morning. 

 








Specifically, Davison testified:

COUNSEL: And at the time you
returned, as I understand it, none of the businesses there in the shopping
center were open?

DAVISON: Not for C Yeah, you=re right; they weren=t open.

COUNSEL: And you guys were not
returning with the expectation of doing business there at the shopping center
either as an employee or as a customer of any business there?

DAVISON: Yes.

COUNSEL: Yes, you were not planning
to do business?

DAVISON: Yes, correct.

COUNSEL: You guys were simply
planning, as I understand it, to come back and pick up the cars; and then
everyone was going to leave at that point?

DAVISON: That=s correct.

Valadez testified as follows:

COUNSEL: When you guys left Bennigan=s at 1:30 that evening, I take it all
of your business purposes for being at Willowbrook Plaza were over?

VALADEZ: Yes.

COUNSEL: You didn=t have any other business at the
shopping center at that point, I take it?

VALADEZ: No, sir.

COUNSEL: All right.  And then when y=all came back then at about 4:30 or
5:00 o=clock that morning, what was your
intention?  Were y=all just going to get in your cars and leave?

VALADEZ: Yes, sir.

COUNSEL: You did not have any
business purpose for being there at 5:00 o=clock that morning, I take it?

VALADEZ: No.








*                                  *                                  *

COUNSEL: The Bennigan=s closed at 2:00 o=clock in the shopping center; right?

VALADEZ: Correct.

COUNSEL: Around 2:00?

VALADEZ: Correct.

COUNSEL: There wasn=t any other business in the shopping
center that stayed open after that as far as you knew; was there?

VALADEZ: No.

*                                  *                                  *

COUNSEL: And
so when you guys got ready to leave at about 1:30, almost all of the businesses
in the shopping center were closed at that point except for Bennigan=s . . . ?     

VALADEZ: Yes.

COUNSEL: And I guess it=s fair to say that the shopping
center was getting pretty deserted by the time you guys left?

VALADEZ: Yes.








This testimony confirms that the
decedents= only purpose for returning to the Willowbrook Plaza parking lot between
4:00 a.m. and 5:00 a.m. was to retrieve their cars.  They were not invited onto
the property at that time, nor was there any economic benefit to the shopping
center or its tenants from their presence at that time.  See Cowart
v. Meeks, 131 Tex. 36, 111 S.W.2d 1105, 1107 (1938); Ruvalcaba, 64
S.W.3d at 135; cf. Boss v. Prince=s Drive-Ins, 401 S.W.2d 140, 142 (Tex. Civ. App.CWaco 1966, writ ref=d n.r.e.) (assault victim who was
attacked in restaurant parking lot after returning to retrieve a car left there
earlier was not an invitee; victim Aoccupied no better status . . . than
that of a licensee to whom defendant owed no duty to prevent assaults by third
persons for reasons personal to them@).  Appellants= expert, Forrest Franklin,
acknowledged that the decedents= cars were not in the parking lot for any business purpose,
and that the decedents had elected to use the parking lot for their own
purposes.  The decedents had ceased to be invitees by the time they returned to
the parking lot between 4:00 a.m. and 5:00 a.m. 

Appellants offer several arguments to
support their assertion that the decedents were invitees when they returned to
the parking lot.  First, they argue that the decedents were invitees when they
first parked in the lot next to Bennigan=s; they contend this invitee status
continued after they left for the Omni Hotel and remained in effect when they
returned.  This argument fails because the complaining party=s status is determined based on the
circumstances existing at the time and place of injury.  Peerenboom, 910
S.W.2d at 161; Graham v. Atl. Richfield Co., 848 S.W.2d 747, 751 (Tex.
App.CCorpus Christi 1993, writ denied). 
Consequently, the decedents= status is determined by the circumstances existing when they
returned to the parking lot between 4:00 a.m. and 5:00 a.m.  The undisputed
testimony establishes that any invitee status they may have had earlier in the
evening ceased by the time they returned because there was no mutual business
purpose for their presence in the nearly deserted parking lot of a completely
closed shopping center.

Appellants also argue that the
decedents were invitees because economic benefits inured to appellees from
having cars left parked in the lot overnight.  The testimony of Davison and
Valadez defeats this assertion.  Their testimony confirms that no economic
benefit accrued from the presence at a closed mall of cars belonging to
individuals who had no business purpose for being in the parking lot between
4:00 a.m. and 5:00 a.m. 

Appellants further argue that the
decedents were invitees when they were shot because it was foreseeable that
patrons of tenant businesses would leave their cars in the lot overnight.  This
argument fails because foreseeability of entry is not the standard for 
determining whether an individual is classified as an invitee.  See Cowart,
111 S.W.2d at 1107; Ruvalcaba, 64 S.W.3d at 135.    








Finally, appellants argue that the
decedents were invitees because they were employed by Babin=s, a tenant of Willowbrook Plaza
shopping center.  However, when the decedents left Babin=s after their shift ended and moved
to Bennigan=s to socialize with friends, they ceased to be invitees based on their
status as employees of Babin=s.   See Peerenboom, 910 S.W.2d at 162‑63
(employee lost invitee status on employer=s premises when shift ended).  And
even if it is assumed that the decedents= initial invitee status as employees
continued after they ended their shift and began socializing at Bennigan=s, that invitee status ended when
they left the shopping center and returned because there was no mutual business
purpose for their presence in the parking lot between 4:00 a.m. and 5:00 a.m. 

On this record, the decedents had
ceased to be invitees when the shooting occurred.

b.         Standards governing liability to claimants who are not
invitees

 

Up to this point, the controlling
legal principles have been reasonably straightforward. The legal path becomes
less clear once it has been established that the decedents were not invitees.

The appellants argue that the
decedents at a minimum were licensees, and that the shooting was foreseeable. 
For their part, the appellees contend that no premises defect liability
attaches regardless of whether the decedents were licensees or trespassers. 
They contend more broadly that they owed no duty to protect the decedents from
criminal conduct by a third party because the shooting was not foreseeable. 

The conventional formulation of a
premises owner=s limited duty to protect against criminal acts by third parties is
couched in terms of foreseeability.  

[F]oreseeability of an unreasonable
risk of criminal conduct is a prerequisite to imposing a duty of care on a
person who owns or controls premises to protect others on the property from the
risk.  Once this prerequisite is met, the parameters of the duty must still be
determined.  Foreseeability is the beginning, not the end, of the analysis in
determining the extent of the duty to protect against criminal acts of third
parties. 

Timberwalk, 972 S.W.2d at 756 (internal
quotation marks omitted).  








The Timberwalk plaintiff was
an invitee, and foreseeability already is incorporated in the duty of care owed
to an invitee.  See id.  Unlike the invitee situation, the conventional
formulations of the duties owed to licensees and trespassers contemplate
something more than mere foreseeability.  See, e.g., Ruvalcaba,
64 S.W.3d at 134-35.  The duty standard for licensees speaks to actual
knowledge of the danger.  Id. at 134; see State v. Williams, 940
S.W.2d 583, 584 (Tex. 1996) (per curiam).  The duty standard for trespassers
speaks to intentional, willful, or grossly negligent conduct.  Ruvalcaba,
64 S.W.3d at 134-35. 

And so the question arises: What role
does foreseeability play when someone other than an invitee
seeks to establish liability against a premises owner or occupier based
on a third party=s criminal conduct?  

The Texas Supreme Court addressed this
question in Mellon Mortgage Co. v. Holder, 5 S.W.3d 654 (Tex. 1999)
(plurality opinion), but the fractured Holder opinion does not provide a
clear answer.  At least seven justices concluded in Holder that
foreseeability informs the duty analysis for claimants other than invitees. 
However, they disagreed about the precise manner in which foreseeability meshes
with the non-invitee categories of premises defect claimants.

In Holder, an on-duty Houston
police officer stopped Holder for an alleged traffic violation late one night
and instructed her to follow his squad car.  Id. at 654.  Holder
followed the officer for several blocks to an unsecured and deserted parking
garage owned by Mellon Mortgage Company.  Id.  There the officer
sexually assaulted her in his squad car.  Id.  Holder sued Mellon; the
trial court granted summary judgment for Mellon; and the court of appeals
reversed.  Id.   The Texas Supreme Court reversed the court of appeals= judgment and rendered judgment for
Mellon.  Id. at 655.  The Texas Supreme Court held that Mellon owed no
duty to Holder to prevent the attack because it was not foreseeable to Mellon
that Aa person would be accosted several
blocks from Mellon=s garage and forced to drive to that garage where she would
be sexually assaulted . . . .@  Id. at 654-55.            








Holder=s exact status was debated on appeal
and in the Texas Supreme Court.  The court of appeals majority concluded that
she was a licensee at the time of the assault.  Holder v. Mellon Mortgage
Co., 954 S.W.2d 786, 798 (Tex. App.CHouston [14th Dist.] 1997), rev=d, 5 S.W.3 654 (Tex. 1999).  A dissenting opinion
concluded that she was a trespasser.  Holder, 954 S.W.2d at 808 (Hudson,
J., dissenting).  This disagreement persisted in the Texas Supreme Court. 
Justice Enoch concluded that Holder was a trespasser.  Holder, 5 S.W.3d
at 661-62 (Enoch, J., concurring).  Justice O=Neill, joined by Chief Justice
Phillips and Justice Hankinson, concluded that Holder was a licensee.  Id.
at 673 (O=Neill, J., dissenting).  A plurality opinion written by Justice Abbott,
joined by Justices Hecht and Owen, and a concurring opinion by Justice Baker
addressed liability without determining whether Holder was a licensee or a
trespasser.  Id. at 655 (plurality opinion); see also id. at 662
(Baker, J., concurring).  No justice concluded that Holder was an invitee.  Id.
at 661 (Enoch, J., concurring).

In addressing Mellon=s no-duty argument, the plurality
opinion applied a threshold foreseeability analysis that did not depend on the
plaintiff=s status as a licensee or trespasser.  Id. at 655 (plurality
opinion).  The plurality opinion divided the threshold foreseeability analysis
into two prongs C foreseeability of the crime and foreseeability of the victim
C and concluded that the crime was
foreseeable but Holder was an unforeseeable victim.  Id.  The plurality
opinion therefore concluded that Mellon owed no duty to Holder to prevent the
sexual assault.  Id. at 658.  In reaching this conclusion, the plurality
opinion disclaimed any intention to abandon the traditional categories used to
classify premises defect claimants.  Id. at 655 n.3.  ABecause Holder was an unforeseeable
victim regardless of her status, it is unnecessary to determine into which of
the three categories she falls.@  Id. at 655.








Justice Baker concurred in the
judgment.  He, too, applied a threshold foreseeability analysis, but concluded
that the crime was not foreseeable.  Id. at 663-65 (Baker, J.,
concurring).  He rejected the plurality=s focus on foreseeability of the
victim.  A[R]ather than change the law of duty to add a second-prong foreseeability
analysis, we need only consider the Timberwalk factors C similarity, proximity, recency,
frequency, and publicity C to analyze foreseeability within the duty context as it
arises here.@  Id. at 663.

Justice Enoch also concurred in the
judgment.  He rejected application of foreseeability as a threshold inquiry,
and instead applied duty principles tied to the injured party=s status.  Id. at 660-62
(Enoch, J., concurring).  He concluded that Holder was a trespasser; that
Mellon owed to Holder a duty not to cause her injury intentionally, wilfully,
or through gross negligence; and that Mellon conclusively established it had
not breached the limited duty it owed to Holder as a trespasser.  Id. at
662.

In her dissent, Justice O=Neill agreed with Justice Enoch that Athe traditional premises liability
distinctions govern our analysis.@  Id. at 669 (O=Neill, J., dissenting).  The dissent
further stated that Athe concept of foreseeability in the context of premises
liability is embodied in@ the classifications of invitee, licensee, and trespasser.  Id.
at 666.  After determining that Holder was a licensee, and that Mellon owed to
Holder the general duty of care owed to licensees, the dissent concluded that Afact issues exist as to the
foreseeability of the risk of criminal conduct in the garage and Mellon=s actual knowledge of that risk.@  Id. at 673.

After Holder, it is clear that
the longstanding classifications of invitee, licensee, and trespasser continue
to apply.  At least seven of the eight justices who participated in Holder
agree on this point.[4]  The parties
to the present appeal do not argue that the traditional classifications were
jettisoned in Holder or should be discarded.  








Seven of the eight participating
justices also appear to agree that foreseeability of the crime must be
considered.  But it is not clear how foreseeability of the crime
must be considered.  The plurality opinion and Justice Baker=s concurring opinion treat
foreseeability of the crime as a threshold inquiry that is Acomplementary, not contradictory, to
the traditional premises liability categories.@  Id. at 655 n.3 (plurality
opinion); see also id. at 663 (Baker, J., concurring) (ATo the extent that the law does
impose a duty, foreseeability is the initial analysis.@).  The dissenters, in contrast,
conclude that foreseeability Ais embodied in the classifications that have defined a
landowner=s duty for over one hundred years.@  Id. at 666 (O=Neill, J., dissenting).

In the final analysis, there is
little practical difference between characterizing foreseeability of the crime
as a threshold inquiry or as an implicit concept Aembodied@ in the traditional invitee,
licensee, and trespasser classifications.  Foreseeability of the crime must be
considered under either characterization.  It is a necessary C but not sufficient C condition of liability when
licensees or trespassers seek to establish a landowner=s liability for third party criminal
conduct.  

When foreseeability of the crime is
considered on this record, the trial court=s summary judgment must be affirmed
because Heng=s shooting of Messimer and Ciaramitaro was not foreseeable as a matter of
law.  See Trammell Crow Cent. Tex., Ltd. v. Gutierrez, 267 S.W.3d
9, 15-17 (Tex. 2008); Timberwalk, 972 S.W.2d at 757-59.  This conclusion
applies regardless of whether the decedents were licensees or trespassers.








In addressing foreseeability of
particular criminal conduct on a landowner=s property, courts consider whether
criminal conduct previously occurred on or near the property;[5]
how recently it occurred; how often it occurred; similarity of the previous
conduct to the conduct at issue; and the level of publicity given to previous
occurrences to indicate that the landowner knew or should have known about
them. Trammell Crow, 267 S.W.3d at 12, 15; Timberwalk, 972 S.W.2d
at 757.  The occurrence of a significant number of crimes within a short time
period strengthens the claim that the particular crime at issue was
foreseeable; the occurrence of a few crimes over an extended period negates
foreseeability.  Timberwalk, 972 S.W.2d at 758.  Evidence is not
considered in hindsight, but rather in light of what the premises owner knew or
should have known before the criminal act occurred.  Trammell Crow, 267
S.W.3d at 15; Timberwalk, 972 S.W.2d at 757.  

The Texas Supreme Court=s recent foreseeability analysis in Trammell
Crow is instructive.  In Trammell Crow, Luis Gutierrez and his wife
were leaving the movie theater at Quarry Market, a 53-acre mall, after watching
a movie.  267 S.W.3d at 11.  Luis was shot while walking to their car.  Id. 
Luis=s family sued Trammell Crow, the mall
property manager, claiming that Luis was shot during a botched robbery and that
Trammell Crow negligently failed to provide adequate mall security.  Id.
at 11-12.  A jury returned a verdict in favor of Luis=s family.  Id. at 12.  The
court of appeals affirmed the trial court=s judgment in favor of Luis=s family, holding that (1) Trammell
Crow owed a duty to Luis as an invitee; and (2) sufficient evidence supported
the jury=s finding that Trammell Crow breached
its duty.  Id.  On petition for review, Trammell Crow argued that it
owed no duty because the shooting was unforeseeable.  Id.  

The court noted that 227 crimes had
been reported at Quarry Market in the two years before Luis=s death.  Id. at 13.  Most
were thefts, burglaries, auto thefts, vandalism, and assaults.  Id.  Ten
of the 227 crimes C all robberies C were classified as violent.  Id.
A[A]lthough the repeated occurrences
of theft, vandalism, and simple assaults at the Quarry Market signal that
future property crimes are possible, they do not suggest the likelihood of
murder.@  Id.  Therefore, the Court
limited its Areview to the ten instances of violent crime that took place at the
Quarry Market during the two years prior to Luis=s death.@  Id.  Weighing proximity,
publicity, recency, frequency, and similarity to determine whether the shooting
was foreseeable, the Court held:








Considering the five factors together, we cannot
conclude that Luis=s murder was foreseeable.  Trammell Crow had knowledge
of violent crimes that were committed at the Quarry Market within a reasonable
time prior to Luis=s death.  Nevertheless, these previous crimes were not
sufficiently frequent and similar to give rise to a duty in this case.  Only
four times in two years were robberies committed without a prior demand for
property.  Only three times in two years was a weapon clearly used to commit a
robbery.  In those same two years, no weapon had been used to harm someone, no
victim had been seriously injured, and in only one case was a victim attacked
prior to the accompanying theft.  Even viewing the attack on Luis as a robbery,
as we presume the jury did, the circumstances of this attack are extraordinary.
. . .   Nothing about the previous robberies committed at the Quarry Market put
Trammell Crow on notice that a patron would be murdered as part of a robbery on
its premises.  Thus, Luis=s death was not foreseeable, and Trammell Crow did not
have a duty to prevent the attack.  

 

Id. at 17.  

In this case, appellants argue that
Willowbrook Plaza was a dangerous place and that the decedents= death was foreseeable.  To establish
foreseeability, appellants point to ERMC II=s criminal activity incident reports;
Houston Police Department on-line crime report data for an area referred to as
Beat 5F40; and memoranda from Larry J. Faulkner, ERMC II=s security director at Willowbrook
Plaza shopping center.  Appellants also contend CBL=s assistant director of operations,
Doug Meeks, admitted that (1) Awhen CBL took over the management of [the shopping center],
it knew that there was a need for security services;@ and (2) Aburglaries of vehicles can easily
escalate into more violent crimes and car thefts can escalate into violent
crimes if the owner comes and finds somebody attempting to steal their car.@  We review this evidence considering
the Timberwalk foreseeability factors discussed in Trammell Crow.

The incident reports for Willowbrook
Plaza shopping center show that two violent crimes and one potentially violent
crime occurred at the shopping center between October 1, 2001 and February 2,
2003.  At 10:00 p.m. on March 2, 2002, a purse was stolen at gunpoint and this
crime was recorded as a robbery.  At 9:40 p.m. on April 30, 2002, an attempted
robbery with a knife was recorded.  And at 9:40 p.m. on November 16, 2002, a
firearm was discharged at another vehicle; the incident was recorded as deadly
conduct and a potentially violent crime.  During this 16-month period, four
burglaries and one act of vandalism occurred after 2:00 a.m.  No violent crimes
occurred after 2:00 a.m.








Faulkner=s March 12, 2002 memorandum to ERMC
II=s regional manager, Jeff Pugh, stated
that two businesses had been burglarized between December 2001 and March 2002.
Faulkner believed that Pugh knew of these incidents through conversations with
Faulkner and Meeks.  According to Faulkner=s memorandum, Houston police and CBL
had been thoroughly involved with all incidents; a gang task force had been at
the shopping center; and undercover officers had been working at the shopping
center Ato help control and arrest those auto
burglary offenders.@  Contrary to appellants= assertion, this memorandum does not
show that burglaries associated with gang activity Ahad escalated to such an extent that
Houston Police Department had periodically dispatched its Gang Task Force to
the Willowbrook Plaza shopping center.@

Appellants
also point to Faulkner=s April 19, 2002  memorandum to Meeks, claiming that it
warned about a lack of security after normal business hours and that Athe same criminal element could
strike the businesses just as easily between 4am and 6am.@  The memorandum states:            

Doug,

This new schedule is being presented as a revamping of
the 153 available security man‑hours for Willowbrook Plaza.  The changes
are to better serve the tenants of the center.  There will be more man‑hours
spent during the occurrence of the majority of incidents in the center.  There
are not enough man‑hours available to cover the hours from 2am to 6am. 
The schedule could be pushed to 3am and possibly 4am.  If this were to be put
in place, the center would not have much to gain and will lose some benefits in
the earlier hours of security operation.  By 2am, the center is virtually
closed.  The same criminal element could strike the businesses just as easily
between 4am and 6am.  I do know that the Houston police patrol the center in
their routine of the early morning hours.

If you agree with this schedule change, I would like
to forward the attached memo to the tenants of Willowbrook Plaza.  

 








Reading the entire memorandum, it is
clear that its purpose was to propose a schedule change of security patrols to
target the times at which the majority of criminal incidents at the shopping
center occurred.  Although Faulkner hypothesized that criminal activity after
business hours could occur, he clearly stated that Athe center would not have much to
gain and will lose@ security benefits if security was extended to 3:00 a.m. or
4:00 a.m.  because Athe center is virtually closed@ by 2:00 a.m.  Reviewing incident
reports after the schedule change was implemented, the incidents of
auto-related crimes decreased by almost 50 percent.  Faulkner=s acknowledgment that criminal
activity could occur at any time is neither evidence of nor an admission of
foreseeability.

Appellants also rely on deposition
testimony in which Meeks agreed that CBL Aknew that there was a need for
security solutions.@  Meeks testified as follows:

 COUNSEL: When CBL took over the
management of Willowbrook Plaza, it knew that there was a need for security
solutions, security presence on the property, correct?

MEEKS: Yes, sir.

COUNSEL: The situation was not such
that you could simply just rely on the police to take care of things like they
would in an average neighborhood or an average strip center somewhere else in
town.  [Objections omitted]

MEEKS: Can you repeat that again?

COUNSEL: Sure.  If this was some
5,000‑square foot strip center down on 1960, it might be enough just to
rely upon the average HPD or Precinct 4 patrol or whatever police jurisdiction
you=re in, correct?

MEEKS: Correct.

COUNSEL: But because you=re operating a 42‑acre,
multi-100,000 square foot center that attracts people from miles around, a
reasonable operator of that facility is going to have a different security
solution, correct, more than just relying on the local police patrols?

MEEKS: Possibly.








The full context of this deposition
testimony reveals that Meeks=s testimony related to general management decisions to
provide security based on the size of the property.  Nothing in the testimony
reveals knowledge of any general or specific criminal threats to the property. 
Rather, Meeks clarified that because of the shopping center=s size as a 42‑acre, multi‑100,000
square foot center, it would not have been enough to rely only on police
patrols for security. 

Appellants also point to Meeks=s alleged admission Athat burglaries of vehicles can
easily escalate into more violent crimes.@  Meeks testified as follows:

COUNSEL: Would you agree that
burglaries of vehicles can easily escalate into more violent crimes [objections
omitted] B if there=s a confrontation between people?

MEEKS: Possible.

COUNSEL: Would you agree that it=s certainly reasonable to expect that
car thefts can escalate into violent crimes if the owner comes and finds
somebody stealing their car?

[Objections omitted]

MEEKS: Possible.

COUNSEL: It=s not out of the question is it?

MEEKS: No, it=s not.

COUNSEL: You read about it happening
in the newspaper, don=t you?

MEEKS: Yes.

Meeks=s testimony demonstrates that he
responded APossible@ when asked questions about hypothetical situations.  None of the
questions asked about specific conditions or circumstances related to
Willowbrook Plaza shopping center. 

Finally, appellants assert that the
incident in this case was Adefinitely foreseeable@ because the Houston Police
Department=s on-line crime report data for Beat 5F40, which includes Willowbrook
Plaza shopping center, shows Athere were 34 violent crimes and 902 major crimes in 1998,
and from 2000 to 2002, auto-related criminal activity in the same area was
increasing significantly from 68 auto-related incidents in 2000 to 126
auto-related criminal activities in 2002.@  This report was available to CBL. 








Beat 5F40 includes at least three
shopping centers: Willowbrook Plaza, Willowbrook Commons, and Willowbrook
Mall.  The record does not establish how large a territory Beat 5F40 is and how
many square miles it encompasses.  Geographic area is an important
consideration.  For a landowner to foresee criminal conduct on property, the
evidence must reveal that Aother crimes have occurred on the property or in its
immediate vicinity@ because distant criminal activity bears less relevance.  Timberwalk,
972 S.W.2d at 757.  The record does not establish that all crimes recorded in
Beat 5F40 are in the immediate vicinity of Willowbrook Plaza.  

Further, appellants do not explain
how 34 violent crimes in 1998 establish foreseeability of the incident in
February 2003.  Appellants also do not explain how an increase in auto-related
criminal activity establishes foreseeability of murder.  See Trammell Crow,
267 S.W.3d at 13 (Aalthough the repeated occurrences of theft, vandalism, and
simple assaults at the Quarry Market signal that future property crimes are
possible, they do not suggest the likelihood of murder@). 

The Beat 5F40 crime report data
reveal that in the two years before the decedents= murder, five violent crimes occurred
after 2:00 a.m.  The violent crimes involved three robberies and two aggravated
assaults.  No murder was recorded for Beat 5F40 until the decedents were shot
on February 2, 2003.  In Trammell Crow, the Court held that 10 robberies
in two years were not sufficiently frequent to make it reasonably foreseeable
that a patron would be murdered as part of a robbery on its premises.  Id.
at 17.  The same conclusion applies to the data in this case.








Appellants contend that appellees,
within a reasonable time prior to the decedents= deaths,  knew of violent crimes that
occurred at Willowbrook Plaza shopping center and the entire area of Beat 5F40,
and also knew of the five non-violent crimes that occurred at the shopping
center after 2:00 a.m.  In the 16 months before the decedents= deaths, two violent crimes were
committed at the shopping center; neither occurred after 2:00 a.m.  Only five
non-violent crimes were committed after 2:00 a.m. when all businesses were
closed.  There is no evidence that anyone was injured as a result of either the
violent or non-violent crimes that occurred at the center.  For the entire Beat
5F40 area, only five violent crimes were recorded after 2:00 a.m.  No murders
occurred on the premises or anywhere in the Beat 5F40 area in the 16 months
before the shooting.  

Based on Trammell Crow, these
previous crimes were not sufficiently frequent or similar to make it
foreseeable that the decedents would be murdered at the shopping center between
4:00 a.m. and 6:00 a.m.  See id.  Additionally, as in Trammell Crow,
the circumstances here were Aextraordinary@ in light of the chain of events that unfolded as Heng was
discovered in Messimer=s car, beaten, and ordered to leave on foot following the
vandalizing of his car before returning to kill the decedents.  These
circumstances underscore the lack of foreseeability.  Id.  

Having determined that the shooting
in this case was not foreseeable, we hold that, as a matter of law, Willowbrook
Plaza, PPG Venture, and CBL did not owe the decedents a duty to protect them
from Heng=s criminal acts.  We thus conclude that appellants cannot prevail under a
premises defect claim as a matter of law and therefore cannot establish the
necessary wrongful act to pursue their wrongful death and survival actions. 
Accordingly, we hold that the trial court correctly granted summary judgment to
Willowbrook Plaza, PPG Venture, and CBL, and we overrule appellants= issues regarding premises defect.

Conclusion

Because appellants failed to
establish a wrongful act under a premises defect theory or a negligent activity
theory, they cannot prevail on their wrongful death and survival actions as a
matter of law.  The trial court correctly granted summary judgment to ERMC II,
Willowbrook Plaza, PPG Venture, and CBL.  We affirm the trial court=s judgment.

 

/s/        William J. Boyce

Justice

 

Panel consists of Chief Justice
Hedges, Justice Boyce and Senior Justice Price.[6]









[1]           In a separate issue, appellants also
contend that ERMC II failed to establish that it satisfied its duty to exercise
ordinary care.  Because this argument is subsumed within appellants= negligent activity argument, we will address it in
conjunction with the negligent activity analysis.





[2]           Appellants identify the appellees in their
brief as ERMC, ERMC LP, ERMC LP d/b/a ERMC Security, ERMC II, LP d/b/a ERMC
Security, ERMC II, LP, CBL/GP, Inc., CBL & Associates, Inc., CBL &
Associates Properties, Inc., CBL & Associates Limited Partnership, CBL
& Associates Management, Inc., Willowbrook Plaza Limited Partnership d/b/a
Willowbrook Plaza, and PPG Venture I Limited Partnership.  The proper appellees
on appeal are ERMC, ERMC II, LP d/b/a ERMC Security, CBL & Associates
Management, Inc., CBL/GP, Inc., Willowbrook Plaza Limited Partnership, and PPG
Venture I Limited Partnership.  These entities were sued in appellant=s live pleadings; captured in the severance order that
made the summary judgment orders final and appealable; and then named in the
notice of appeal.  Because appellants do not pursue claims against ERMC and
CBL/GP, Inc., on appeal, we address only the claims against ERMC II, CBL,
Willowbrook Plaza, and PPG Venture.





[3]           Appellants disclaim on appeal the
applicability of a premises defect theory against security company ERMC II. 
Therefore, we do not address premises defect with respect to ERMC II.

 





[4]           Justice Baker made no reference to the
traditional categories; his concurring opinion focuses on foreseeability of the
crime.  Justice Gonzalez did not participate in the decision.





[5]           For a landowner to foresee criminal conduct
on property, there must be evidence that other crimes have occurred on the
property or in its immediate vicinity.  Timberwalk, 972 S.W.2d at 757.





[6]           Senior Justice Frank C. Price sitting by
assignment.