**Appellees' Motion for Rehearing Overruled; Appellees' Motion for En Banc Consideration Denied as Moot; Opinion of August 14, 2014 Withdrawn; Reversed and Remanded and Substitute Memorandum Opinion filed December 9, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00123-CV

---

### ALAN PETRIE, Appellant

### V.

### UDR TEXAS PROPERTIES, L.P. d/b/a THE GALLERY APARTMENTS, UNITED DOMINION REALTY TRUST, INC., ASR of DELAWARE, L.L.C. and UDR WESTERN RESIDENTIAL, INC., Appellees

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-74656**

---

## S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

We overrule appellees' motion for rehearing, deny appellees' motion for en banc consideration as moot, withdraw our memorandum opinion issued August 14, 2014, and issue this substitute memorandum opinion.

In his first issue, Alan Petrie appeals the final judgment of the trial court which, after a pre-trial evidentiary hearing, found that UDR Texas Properties, L.P. d/b/a The Gallery Apartments, United Dominion Realty Trust, Inc., ASR of Delaware, L.L.C. and UDR Western Residential, Inc. ("Gallery") owed no duty to Petrie to protect him from the criminal acts of third parties committed on its premises. In his second issue, Petrie asserts the trial court erred in signing an order after it lost plenary power. We reverse and remand.

## I. BACKGROUND

Petrie was a waiter at a club located on Richmond Avenue in an area in Houston, Texas known as the "Richmond Strip." After leaving work on the night of the incident, he drove home to change clothes before attending an after-work birthday party of a co-worker. The party was to take place at the Gallery Apartments, located at 6220 Fairdale Street. Petrie entered Gallery's front parking lot between 1:45 a.m. and 2:00 a.m. and parked his vehicle in one of the spaces designated for visitors' parking.

Petrie called his girlfriend and then noticed another car blocked his vehicle from behind. In his mirror, Petrie saw two males exit the other car. One of them approached Petrie on the driver's side, brandishing a shotgun. That man pointed the gun at Petrie through the driver's side window, while violently ordering him to exit his vehicle. Petrie was ordered to give the men his wallet and keys; he complied. The suspect with the gun then ordered Petrie to lie face down on the ground. When Petrie hesitated, the suspect shot Petrie in left knee, knocking him to the ground. The suspect then placed the gun to Petrie's head and pulled the trigger; however, it did not discharge. Petrie crawled under the car next to his vehicle, and both suspects fled—one stole Petrie's vehicle, and the other fled in the car in which they had arrived. Petrie was transported to the hospital by ambulance.

2

The Houston Police Department categorized the attack on Petrie as an aggravated robbery.

Petrie sued Gallery, alleging it was negligent in failing to make the premises safe or to warn residents and invitees of the dangerous conditions on and around the premises.

As part of its pre-trial, the trial court conducted a two day evidentiary hearing on the question of duty; specifically, whether Gallery owed any legal duty to Petrie under the standards set forth in *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749 (Tex. 1998). Both sides presented evidence. At the conclusion of the hearing, the trial court determined as a matter of law Gallery owed no duty to Petrie.[1] The trial court signed a final judgment ordering that Petrie take nothing against appellees.

## II. STANDARD OF REVIEW

A trial court has the authority to conduct pre-trial proceedings. Tex. R. Civ. P. 166. This includes the authority to rule on questions of law, such as the existence of a legal duty. *Walden v. Affiliated Computer Services, Inc.*, 97 S.W.3d 303, 322 (Tex. App.—Houston [14th Dist.] 2003, pet denied). This court reviews questions of law under the *de novo* standard. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Environmental Procedures, Inc. v. Guidry*, 282 S.W. 3d 602 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

---

[1] While the qualifications of the expert witnesses were not the subject of the hearing, Gallery made an oral motion to strike Petrie's expert witness claiming he used a "flawed methodology." Without addressing the merits of motion, we note that the final judgment states only that Gallery owed no duty to Petrie. It contains no ruling on Gallery's motion; thus, the court either denied the motion, or did not rule on it. Neither Gallery nor Petrie assert error on this issue.

### III. TRIAL COURT'S PLENARY POWER

Because it implicates the scope of the summary judgment record we will examine in connection with duty, we first address Petrie's second issue, contending the trial court signed an order on Gallery's objections to deposition testimony offered at the hearing after its plenary power expired.

The pre-trial evidentiary hearing took place in December 2012. The trial court signed the final judgment in Gallery's favor on January 16, 2013. Where, as here, there was no motion for new trial (or other post-judgment motion which could extend the plenary power of a trial court), a trial court loses plenary power over a final judgment thirty days after the signing of a final judgment. Tex. R. Civ. P. 329b(d); *see also Bass v. Bass*, 106 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, the trial court lost plenary power on February 15, 2013.

The May 15, 2013 order is a series of rulings on objections to the deposition testimony of Sean Luke, Alvin Cooper, Rick Breitigam, and Melinda Silguero, sustaining fourteen of Gallery's objections to the deposition testimony, and overruling five. The order does not reference any complaint by Gallery that the deposition testimony was not "formally admitted" at the evidentiary hearing. Additionally, while Gallery filed a motion to strike the deposition testimony, the motion did not raise the issue of whether the testimony was formally admitted. The substance of the motion was relevance—an issue both sides briefed in the trial court.

Petrie seeks a determination that the May 2013 order is void. Gallery asserts this court need not reach this issue because it would have no effect on the final judgment, or was otherwise harmless error because it merely corrected a clerical mistake. We disagree with Gallery. First, there is nothing in the record showing

the trial court ruled on Gallery's objections prior to the date it signed the final judgment. Second, there is nothing in the record regarding the trial court's rulings on these objections at the pre-trial hearing. Rather, at the hearing, the trial court stated it would consider the deposition testimony, and Gallery never argued to the trial court that the testimony had not been formally admitted. The trial court's final judgment reflects it "consider[ed] . . . all evidence."

Gallery's reliance on *Parex Resources, Inc. v. ERG Resources, LLC*, 427 S.W.3d 407 (Tex. App.—Houston [14th Dist.] 2014, pet. filed), is misplaced. In *Parex*, the trial court expressed that it was not admitting certain exhibits, would consider objections to them, and would hold a hearing, if necessary, to address the objections. *Parex*, 427 S.W.3d at 417–418. Here, the trial court was clear it would consider the deposition testimony, and the final judgment reflects it considered all evidence. Gallery did not object at any time that the deposition testimony had not been formally admitted; therefore, it is properly before this court. Additionally, at oral argument, Gallery's counsel indicated this court can assume, based on the trial court's statement at the evidentiary hearing and the reference in the final judgment, that the trial court considered all evidence, and the deposition testimony is part of the appellate record.

Finally, the May 2013 order was not the correction of a clerical error made in rendering the final judgment over which the trial court may retain jurisdiction. *See Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 58 (Tex. 1970); *In re Rollins Leasing, Inc.*, 987 S.W.2d 633, 636 (Tex. App.—Houston [14th Dist.] 1991, no pet.). Thus, the trial court lacked plenary power to issue the May 2013 order, and we hold it is void. Accordingly, we sustain Petrie's second issue and consider the deposition testimony in addressing his first issue.

5

## IV. DETERMINING WHETHER GALLERY OWED A DUTY TO PETRIE

In his first issue, Petrie challenges the trial court ruling that Gallery owed no legal duty to him. As a threshold to the imposition of tort liability, there must be evidence of a duty owed to another and a violation of that duty. A determination of duty is a question of law. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). In general, "a person has no legal duty to protect another from the criminal acts of a third person." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). An exception arises when one who controls the premises "knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *See Lefmark Management Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997); Restatement (Second) of Torts § 344 (1965). The potential "unreasonableness and foreseeability of harm" is considered as a whole, not as separate elements requiring independent proof.[2] Foreseeability turns on "the risk and likelihood of injury" to a plaintiff, which is viewed from the standpoint of what the landowner knew or should have known. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010).

Evidence of "'specific previous crimes *on or near* the premises'" can establish foreseeability. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008) (emphasis added) (quoting *Timberwalk Apart., Partners, Inc. v. Cain*, 972 S.W.2d 749, 756) (citing *Walker*, 924 S.W.2d at 377)). The premises owner must be able to foresee only the "general danger," not the "exact sequence

---

[2] Thus, we disagree with Gallery's argument that this court must affirm the judgment because Petrie failed to separately brief whether the risk of harm was unreasonable. "The unreasonability of a risk *cannot be completely separated from its foreseeability*. It turns on the risk and likelihood of injury to the plaintiff…." *Del Lago*, 307 S.W.3d at 770. (Emphasis added). The analysis is whether the *risk* of criminal conduct is "so great that it is both unreasonable and foreseeable." *Timberwalk*, 972 S.W.2d at 756. (Emphasis added). We believe that whether the risk of criminal conduct is both unreasonable and foreseeable is determined by assessing the five *Timberwalk* factors. *Timberwalk*, 972 S.W.2d at 757–59.

of events that produced the harm." *Walker*, 924 S.W.2d at 377. In *Walker*, the "general danger" was violent crime on the premises, and the supreme court held that conduct "on or near" the premises may be some evidence that harm is foreseeable. *Id*. (citing *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 550–51 (Tex. 1985)). Whether the risk of criminal conduct is foreseeable "must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred." *Timberwalk*, 972 S.W.2d at 757.

> In determining whether the occurrence of certain criminal conduct … should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.

*Id.*

These considerations have been refined and are generally referred to as the "*Timberwalk* factors": proximity, recency, frequency, similarity, and publicity. None are considered in a vacuum—all must be considered together in determining whether the criminal act was foreseeable. *Timberwalk*, 972 S.W.2d at 759 (holding sexual assault not foreseeable where there was only one sexual assault on the premises in the preceding year and only six assault-type crimes in neighboring complexes, none of which were reported in the media or to Timberwalk).

Further, even though the premises owner may have no specific and direct knowledge that criminal activity may harm an invitee on its premises, the owner may have a duty to protect the invitee because past criminal activity makes future harm foreseeable. Relatively few incidents of violent crime may not give rise to a determination that the risk of harm was unreasonable, whereas a large number

would be some evidence of foreseeability. *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 657 (Tex. 1999) (concluding 190 violent crimes in the vicinity is some evidence of foreseeability). "The nature and character of the premises can be a factor that makes criminal activity more foreseeable." *Del Lago,* 307 S.W.3d at 768 (holding risk of harm foreseeable in bar even though there were few prior incidents involving criminal behavior).

With these factors in mind, we review the evidence to determine if the criminal conduct was foreseeable, thereby imposing a duty on Gallery to protect Petrie from the dangers associated that criminal conduct.

## A.      Proximity

A landowner cannot foresee criminal conduct occurring on its property unless there is evidence that other crimes occurred on the property, or in the immediate vicinity of it. *See Walker*, 924 S.W.2d at 377 (stating analysis of crime rates at an apartment complex and residential neighborhood across the street is proper geographic area). Therefore, courts look to specific and narrow areas either on or near the premises owner's property in determining whether criminal conduct is foreseeable. *See Timberwalk*, 972 S.W.2d at 757.

In this case, Petrie's security expert, James Murphy, reviewed over 220 incident reports from the Houston Police Department. All reports were within a one-half mile radius around Gallery. He adopted this boundary from a prior expert who had utilized it. Both he and Gallery's security expert, Dr. Merlyn Moore, agree that one mile has been used as a common distance boundary. They also agree the determination as to proximity/geographic area is fact specific.

Murphy excluded property crimes, simple assaults, and other non-violent crimes. The reports he reviewed were from the two years preceding Petrie's

incident. Murphy analyzed the details of each report using these guidelines: the title of the police report itself; definitions in the Texas Penal Code; definitions of violent crime on the FBI Uniform Crime Reporting System; and definitions provided under the Uniform Crime Report. He documented the information in each report, categorizing each incident of crime, the type of premises, date and time, and whether it was sufficiently similar to the aggravated robbery of Petrie.

Of the crimes in this one-half mile radius, Murphy determined there were 150 aggravated robberies, twenty-seven aggravated assaults, nine murders/attempted murders, five rapes, twenty-four robberies, and two assaults. Approximately half of these violent crimes occurred in 2003, and half took place in 2004. There were fifteen violent crimes within the one-half mile radius of Gallery in the one month preceding the attack on Petrie. Not including the attack on Petrie, Murphy found one aggravated assault and three rapes took place on Gallery's premises.

Murphy then analyzed this data, considering it within the context of the remaining *Timberwalk* factors. Because of the level of violent crime near or on the premises, Murphy opined that the attack on Petrie was foreseeable.

Gallery's expert, Moore, conducted a similar review; however, he focused largely on crimes which occurred *on* Gallery's premises, rather than *near or in the vicinity* of the incident. *See Rivera v. South Green Limited Partnership*, 208 S.W.3d 12, 19 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding affidavit does not satisfy *Timberwalk* when there is no opinion or evidence regarding crimes near or in the vicinity of the premises at issue). Moore also analyzed the ultimate disposition of the incident reports; that is, whether the reports were referred to or resulted in a criminal prosecution. Moore believed several of the cases were not prosecuted for various reasons, including those where the police

9

thought certain reports contained a level of untrustworthiness, those with a complaining witness unwilling or unable to provide information, and those which were not prosecuted simply due to an inability to obtain sufficient evidence to continue the investigation. Moore did not, however, quantify those cases. He also described the "Positive Interaction Program" conducted by the Houston Police Department where officers advise property managers of crime, and trends in crime, in the areas where the apartment complexes are located. Moore recommended that property managers attend these meetings.

Moore testified that Murphy's use of a one-half mile radius failed to account for crime (or lack thereof) on the north side of Richmond where the Gallery Apartments are located. Moore did not explain how the one-half mile radius, which necessarily included both the north *and* south sides of Richmond, would not take into consideration what he believed to be the "safe" area on the north side of Richmond. He discussed the crime on the south side of Richmond and attributed that to several incidents of graffiti, otherwise known as "tagging" by a gang known as the "Southwest Cholos." However, Moore provided no basis for his claim that gang activities existed to a greater degree on the south side of Richmond. Moore acknowledged one incident report referenced that a member of the "Southwest Cholos" gang, known to the Houston Police Department to be violent, actually lived at the Gallery apartments.

After Moore reviewed the incident reports, focusing almost exclusively on those occurring on Gallery's premises, he opined the crimes did not give rise to a foreseeable duty on the party of Gallery.

## B. Recency and Frequency

Because these two factors relate to the timing of criminal activity, they are often viewed together. *See Trammell Crow*, 267 S.W.3d at 15. In this case, the

10

timeframe considered by the experts was two years prior to the incident involving Petrie, specifically, January 2003-January 2005. In that time frame, as noted above, there were over 220 incident reports involving violent crime in a one-half mile radius of the Gallery apartments. Further, approximately one-third of those crimes occurred in the six months preceding Petrie's attack, with nearly half of those occurring during the early morning hours, as in Petrie's case. Thus, while there is no specific formula to be utilized in determining whether the crimes were recent or frequent enough, for this twenty-five month period, there were approximately nine violent crimes reported each month, or one every three days. Thus, the recency and frequency of violent crime in this case are similar to that in *Mellon*, in which the supreme court held the crime foreseeable. *See Mellon*, 5 S.W.3d at 657. As the supreme court explained in *Trammell Crow*,

> [A] criminal act is more likely foreseeable if numerous prior crimes are concentrated within a short time span than if few prior crimes are diffused across a long time span. For example, in *Mellon Mortgage Co. v. Holder*, we held that a rape was foreseeable when it took place in an area that had witnessed 190 violent crimes in the space of two years, or one violent crime every four days.

*Trammell Crow*, 267 S.W.3d at 15.

In contrast, of the 227 crimes which occurred in the vicinity of the Quarry Market at issue in *Trammell Crow*, there had been only ten violent crimes in the two years prior to the plaintiff's murder, or one every sixty-nine days. All were robberies that included a demand for property, but no one was injured. Thus, the supreme court held the plaintiff's murder was unforeseeable. *Trammell Crow*, 267 S.W.3d at 16–17; *see also Mayer v. Willowbrook Plaza Limited Partnership*, 278 S.W.3d 901 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (where only four violent crimes involving a demand for property were committed in the two years preceding the incident at issue, the risk of harm was not foreseeable).

11

## C.   Similarity

Previous crimes need not be identical to the crime in question, but they must be "sufficiently similar" to it in order to give notice to the landlord that a specific danger threatens his property.   Where the crime in question is a violent one, evidence of prior assaults and robberies make the risk of a violent crime more foreseeable.  *See Timberwalk*, 972 S.W.2d at 758.  On the other hand, if the prior crimes are those involving domestic violence, the risk of violent crimes, such as murder or rape, is not foreseeable.  *Id*.

The aggravated robbery committed against Petrie involved a victim parked in Gallery's visitor parking lot after 1:00 a.m.  The suspects blocked his car, approached him, armed with a shotgun, and demanded he exit his vehicle and surrender his wallet.  Petrie complied with those demands.  After hesitating to comply with another demand, one of the suspects shot him in the knee, and the suspects then fled.

In the one-half mile radius around Gallery, there was evidence of approximately forty carjackings, nearly 100 violent crimes in apartment complex parking lots and apartment premises, twenty violent crimes near bars and night clubs, thirty-five on commercial premises and thirty-two crimes on roads, streets or sidewalks.  In nearly all of the over 150 aggravated robberies in the area, the suspects approached the victim, showed some form of deadly weapon or used physical force, and demanded property.  Many of the victims also sustained serious bodily injury.   In twenty-nine of the aggravated assaults, the suspect first approached the victim creating a dispute, then the suspect assaulted the victim with deadly force, including the use of a deadly weapon.  Several victims also sustained serious bodily injury.  All of the crimes were crimes against a person, not simply crimes associated with property.

Further, there was evidence of five shootings resulting in death in the vicinity of the apartments within the eighteen months preceding the attack on Petrie. Those incidents occurred in the summer of 2003 through the spring of 2004 on the "Richmond Strip," and were the subject of publicity discussed below. Of those five incidents, four were at or near nightclubs in the area; the 2004 incident involved a valet parking attendant who was shot while attempting to interrupt a car burglary. While all were on the "Richmond Strip," only three of the shootings were within one-half mile of Gallery. The other two shootings were two to three miles away. Not all of the shootings were random; in fact, some were a part of aggravated robberies and carjackings, and some were believed to be associated with gang activity.

## D.    Publicity

While property owners bear no duty to inspect records of crimes near their premises, when a landlord has actual knowledge of previous or the criminal activity is widely publicized, then a claim of foreseeability is strengthened. *Timberwalk*, 972 S.W.2d at 759. Further, in certain circumstances, "there may be a duty to make some inquiries . . . ." *Dickinson Arms-REO, L.L.P. v. Campbell*, 4 S.W.3d 333, 348 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (holding it was reasonable for new management company of apartment complex to make inquiries into criminal activity).

Petrie introduced ten articles from the archives of the Houston Chronicle involving crimes on the "Richmond Strip." All but one of these crimes occurred in 2003, approximately eighteen months prior to the incident involving Petrie. The reason for each of the shootings was unknown, but the articles mention a connection with the high number of "violent carjackings and armed robberies" in the area, as well as a potential link with gang activity. In March 2004, a valet who

13

was attempting to interrupt the burglary of a vehicle was killed. The remaining seven articles detailed follow-up investigations on arrests and convictions in these cases.

Petrie also offered the deposition testimony of four former Gallery residents who lived there at different times during the two years preceding the incident; specifically, Sean Luke, Alvin Cooper, Rick Breitigam, and Melinda Silguero. Luke testified that on one occasion a friend of his had been shot in his pants leg and on another occasion management placed a bulletin in the laundry room warning female residents of a rapist in the area. Cooper offered testimony concerning the vandalism of his vehicle and that of an acquaintance, which he reported to Gallery management. Breitigam testified his apartment was burglarized twice. He reported both incidents to Gallery management and reported one of them to the police. Also, Breitigam's roommate had been "jumped" on the premises near a driveway exit to the street. He did not report this incident, however. Breitigam and the other Gallery residents, Cooper, Luke and Silguero, also testified about the "overflow" of people parking in the Gallery parking lot, simply because there was not sufficient parking space at nearby clubs. They further described signs Gallery posted advising that vehicles would be towed if they were parked improperly because "overflow parking" from the nearby nightclubs occurred on a regular basis. Finally, Silguero, who lived at Gallery from 2003-2005, testified regarding an incident involving her husband. Silguero stated her husband was:

> … walking to his car—and fixing to leave, and so—two guys came up to him and had a gun and told him to give them his wallet.

He refused to comply with the demand, and they ran off. She reported this to the apartment manager, who responded:

> She said that she had made fliers out already, and she had already reported to the whole apartment complex by fliers—letting them know that there was stuff like that going on around the area.

Silguero also testified that she spoke to Gallery's manager, whom Silguero stated was "like a friend" and she knew "everything that was going on." Gallery's manager advised Silguero to call the police when she had problems.

## V. ANALYSIS OF *TIMBERWALK* FACTORS

We now consider the five *Timberwalk* factors, taken together, in order to determine if "the particular criminal conduct that occurred" was foreseeable in light of "specific previous crimes on or near the premises." *See Mellon,* 5 S.W.3d at 656. Evidence is determined in light of what the premises owner knew before the particular criminal act occurred and not by using hindsight. *Trammell Crow*, 267 S.W.3d at 15. Weighing the factors of proximity, publicity, recency and frequency, and similarity, we hold the trial court erred in concluding Gallery did not owe a duty to Petrie.

The proximity was a one-half mile radius around the Gallery apartments—courts generally rely on small geographic areas in considering this factor. *Timberwalk*, 972 S.W.2d at 757. *See also Rivera*, 208 S.W.3d at 19; *Dickinson Arms*, 4 S.W.3d at 338–39 (considering apartment complex, nearby hotel, two nearby apartment complexes, all located within one square mile was appropriate); *Mellon*, 5 S.W.3d at 664 (parking garage and one-quarter mile appropriate); *Plowman v. Glen Willows Apartments*, 978 S.W.2d 612, 618 (Tex. App.—Corpus Christi 1998, pet. denied) (apartment complex and neighborhood surrounding it was proper vicinity). Evidence of criminal conduct in the vicinity must be "especially strong" and show that the risk of criminal activity on the landowner's property has reached a level so as to make it likely and, therefore, foreseeable. *See Timberwalk*, 972 S.W.3d at 757.

Petrie produced evidence of over 220 violent crimes occurring in the vicinity of the Gallery Apartments, with at least one violent and similar crime occurring on the premises. The violent crimes in the vicinity involved a suspect threatening a victim with a gun or other deadly weapon or physical force, a demand for property including a victim's car, and oftentimes physical injury. The number of violent crimes which occurred in 2003 was approximately the same as in 2004. If the number of violent crimes which occurred in the month preceding Petrie's attack occurred in all subsequent months of 2005, it appears the number of crimes would be approximately the same in 2005 as in 2003 and 2004. Thus, it is reasonable to conclude the constant level of violent crime, coupled with Gallery's posting of notices it would tow "overflow" vehicles of non-residents parked on its premises, would give notice to Gallery that violent criminal activity may be likely to "travel to the premises of the business owner." *See Perez v. DNT Global Star, L.L.C.*, 339 S.W.3d 692, 703–04 (Tex. Civ. App.—Houston [1st Dist. 2011, no. pet.) (citing *Timberwalk*, 972 S.W.2d at 757 n. 36)).

In considering publicity, the Houston Chronicle articles describing the shootings which occurred on the "Richmond Strip," including the potential connection between these shootings and gang violence in the area, was evidence that would place Gallery on notice of violent crime in its vicinity. The testimony of Melinda Silguero, who reported a similar crime to the Gallery apartment manager, also constitutes evidence that Gallery was on notice of violent crime on its premises. The manager's circulation of a flier at or near the time of Silguero's report and acknowledgment that "there was stuff like that going on around the area" is also evidence of notice. Even if the evidence of publicity were weaker, however, we believe "the number of similar crimes in the recent past in the immediate vicinity outweighs the publicity factor." *See Rivera*, 208 S.W.3d at 20;

16

*Mellon*, 5 S.W.3d at 657 (holding even where there is no evidence of publicity, that parking garage was in high crime area establishes that Mellon was aware that property crimes occurred).

Finally, these incident reports are evidence of the recency, frequency, and similarity of violent crime in the vicinity of the Gallery apartments. As noted above, there were approximately 100 violent crimes in each of 2003 and 2004. One-third of them occurred in the six months preceding the attack on Petrie, and with fifteen occurring in January, there appeared to be no decrease in the level of violent crime.

While the crimes need not be identical to support foreseeability, at least half of those violent crimes were substantially similar to Petrie's aggravated robbery. *See Timberwalk*, 972 S.W.2d at 757–58. Of the 150 aggravated robberies in the area, over 120 involved the use of a gun; 100 of these robberies occurred on nearby apartment complexes and apartment complex parking lots, and many of the victims sustained injuries.

Further, the crimes which occurred in Gallery's general vicinity were of the type from which it would be reasonably foreseeable to conclude that more violent crime would occur, particularly where there is a confrontation, as there was in the incident involving Petrie. *See Dickinson Arms*, 4 S.W.3d at 347 (holding that nearly 200 crimes, where approximately fifty were burglaries, auto thefts, assaults and thefts, make risk of violent crime, such as murder, foreseeable). Lastly, the sexual assaults in 2004, including the incident report involving the abduction of a tenant from Gallery's premises and her subsequent violent rape off premises (classified as an aggravated assault), as well as a tenant's report to Gallery management of a similar aggravated robbery, cannot be discounted.

17

Therefore, given the large number of similar incidents of criminal conduct in the vicinity of the Gallery Apartments, we conclude there is evidence of the foreseeability of an unreasonable risk of harm that a person on the premises would be the victim of violent criminal conduct.  Based upon our review of the record, we hold the trial court erred in concluding that Gallery owed no duty to Petrie.  Thus, we sustain Petrie's first issue.

Therefore, having sustained Petrie's two issues, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.


/s/     John Donovan
        Justice


Panel consists of Justices McCally, Busby, and Donovan.